# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF FLORIDA, INC.,

*Plaintiff,*

v.

BAKER COUNTY SHERIFF'S OFFICE;
SCOTTY RHODEN, Sheriff;
RANDY CREWS, Undersheriff; and
EVELYN BLUE, Captain, Corrections Division,

*Defendants.*

Case No. 3:22-cv-1044

## COMPLAINT

1.      For the past several months, Plaintiff American Civil Liberties Union Foundation of Florida ("ACLU of Florida") has been investigating allegations of egregious constitutional violations against detained immigrants at the Baker County Detention Center ("Baker") in Macclenny, Florida.  ACLU of Florida attorneys and volunteers have conducted dozens of legal interviews with detained immigrants who have experienced a range of abuses, including physical assault, retaliation, and the denial of basic medical care.  The ACLU of Florida has publicly denounced the conditions at Baker and put forth substantial evidence that the facility is unable to safely and responsibly care for detained

immigrants in civil confinement.  Accordingly, the ACLU of Florida has

advocated not only for a federal investigation into the facility, but also for the

termination of the intergovernmental services agreement ("IGSA") between

Defendant Baker County Sheriff's Office ("BCSO") and U.S. Immigration and

Customs Enforcement ("ICE").

2.      The ACLU of Florida has also developed an innovative partnership

with law school clinics and pro bono attorneys to achieve two critical goals: (i)

improving the historically limited access to legal representation for immigrants

detained at Baker and (ii) ensuring that individuals are able to timely inform the

ACLU of Florida about abuses and inhumane conditions as those issues arise.

Participants in this program, known as the Baker Legal Assistance Program,

obtained approval from ICE and Defendant BCSO to make three trips to Baker in

September and October 2022.  Each visit would include a Know Your Rights

presentation and a number of confidential, one-on-one legal visits to assess

prospective clients' immigration cases, meet with existing clients about the status

of their cases and/or conditions of confinement, and document complaints about

conditions at the facility.

3.      As the date of the first scheduled visit approached, public scrutiny

of Baker continued to increase.  A federal civil rights complaint filed in July 2022

by numerous advocacy organizations vividly illustrated the worsening

conditions at Baker and led to significant media coverage of the allegations.

Defendant Scotty Rhoden, the Baker County Sheriff, became personally involved in the response. He took the unusual step of inviting a local news organization to film inside Baker and announced that he was "not going to . . . allow people to come in here and lie about our facility, the job that our people do here." The news team interviewed the ACLU of Florida's Deputy Legal Director as well, who reiterated that detained individuals are in fact experiencing the abuses alleged in the federal complaint. The article further noted that the ACLU of Florida is not only advocating for unannounced inspections, but also considering "legal action against the facility."

4. The following month, Defendants abruptly canceled the Baker Legal Assistance Program's pre-approved visit to Baker—the ACLU of Florida's first scheduled visit since publicly criticizing conditions at the facility. On the morning of September 7—two days before the scheduled visit—Defendant Evelyn Blue sent an email "postpon[ing]" the visit until further notice. She further stated that the Program's visit scheduled for September 30 would be "reevaluated closer to that date." She provided no explanation in her email for the last-minute cancellation. Nor did any official provide any explanation in subsequent communications over the next two days. On the morning of September 9, the attorneys and law students arrived at the facility in person to meet with clients and prospective clients and were turned away by BCSO employees. As a result, detained immigrants with upcoming bond and

immigration hearings lost the ability to potentially obtain representation, and many others missed the opportunity to speak confidentially with counsel about abusive—and in some cases emergent—conditions.

5.     A central aspect of the ACLU of Florida's work is protecting and defending the rights of individuals detained in immigration custody. Defendants' denial of access to the ACLU of Florida's clients and prospective clients at Baker impedes the organization's ability to achieve that mission.  The ACLU of Florida must have the ability to meet confidentially with individuals who report abusive or inhumane conditions while in ICE custody in order to investigate their complaints, advocate for their rights, and pursue legal action. Defendants' denial of access to the facility thus directly and egregiously inhibits the ACLU of Florida's work and constitutes retaliation in violation of the First Amendment.  It also directly violates the fundamental constitutional rights of the ACLU of Florida's clients and prospective clients, including the right to free speech, the right to counsel, and the right of access to the courts.

6.     The ACLU of Florida and other participants in the Baker Legal Assistance Program plan to visit Baker on September 30, 2022.  That visit, like the previous one, has been pre-approved by ICE and BCSO.  And that visit, like the previous one, will provide a critical opportunity for detained immigrants to seek the advice of counsel on urgent immigration matters and serious, ongoing constitutional violations.  However, Defendants' prior conduct—including the

still-unexplained cancellation of the September 9 visit and Defendant Blue's express statement that the September 30 visit would be "reevaluated" as the date approached—make it unlikely that Defendants will allow this visit and other future visits to proceed as planned without this Court's intervention. Because the denial of access has caused and will continue to cause substantial irreparable harm to the ACLU of Florida and its current and prospective clients at Baker, the ACLU of Florida files this complaint seeking, among other things, preliminary and permanent injunctive relief.

## JURISDICTION AND VENUE

7.     This action to vindicate the First and Fourteenth Amendment rights of the ACLU of Florida and its current and prospective clients is brought under 42 U.S.C. § 1983. This Court has subject matter jurisdiction under Article III of the U.S. Constitution and 28 U.S.C. § 1331.

8.     This Court has jurisdiction to enter declaratory and injunctive relief to recognize and remedy the underlying constitutional and legal violations under 28 U.S.C. §§ 2201 and 2202 (declaratory relief) and the Court's inherent equitable powers.

9.     Venue lies in the United States District Court for the Middle District of Florida because Defendants reside in this district and because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this district. 28 U.S.C. § 1391(b)(1), (2).

**PARTIES**

10.     Plaintiff ACLU of Florida is a 501(c)(3) nonprofit, nonpartisan organization committed to protecting, defending, strengthening, and promoting the constitutional rights and liberties of all people in Florida.  As part of its immigrants' rights work, the ACLU of Florida routinely seeks legal relief on behalf of detained immigrants.  In particular, the ACLU of Florida has filed numerous challenges to the conditions in immigration detention facilities.

11.     Defendant Baker County Sheriff's Office is the law enforcement agency for Baker County, Florida.  BCSO operates the Baker County Detention Center, a detention facility for individuals held in both criminal and immigration detention.

12.     Defendant Scotty Rhoden is the Sheriff of Baker County.  He is the chief law enforcement official in Baker County.  Plaintiff is suing Defendant Rhoden in his official and individual capacities.

13.     Defendant Randy Crews is the Undersheriff of Baker County.  His responsibilities include providing administrative and management assistance to the Sheriff; establishing, coordinating, and implementing departmental policies and procedures; and ensuring compliance with federal, state, and local laws.  Plaintiff is suing Defendant Crews in his official and individual capacities.

14.     Defendant Evelyn Blue is the Captain of the Corrections Division of the Baker County Sheriff's Office.  Defendant Blue is responsible for day-to-day

operations, personnel, facilities, and programs within the Baker County

Detention Center.  Plaintiff is suing Defendant Blue in her official and individual

capacities.

15.     All three individual defendants were at all relevant times, and still

are, acting under color of state law.

## STATEMENT OF FACTS

### Immigration Detention at the Baker County Detention Center

16.     In August 2009, the Baker County Sheriff's Department signed an

Intergovernmental Service Agreement ("IGSA") with ICE to house people in

immigration detention at the newly constructed Baker County Detention Center.

*See* Ex. 1.

17.     The IGSA requires ICE to pay BCSO a fixed amount per detained

individual per day—an amount described in the contract as the "detainee day

rate."  Ex. 1 at Article I(C).

18.     In exchange, BCSO must provide detained individuals with

"safekeeping, housing, subsistence, medical and other services."  Ex. 1 at Article

III(B).  Importantly, BCSO is contractually "required to house detainees and

perform related detention services in accordance with the most current edition of

ICE National Detention Standards"—presently, the 2019 NDS.[1] Ex. 1 at Article

V. Those standards govern all aspects of immigration detention, including the

availability of medical services, the use of force against detained individuals, and

the provision of food, water, and personal hygiene items.

19. As particularly relevant here, the 2019 NDS require Baker to

guarantee access to counsel for detained individuals. The ICE standard on

visitation makes clear that "[f]acilities *shall allow* detainees to meet privately with

their current or prospective legal representatives and legal assistants." 2019 NDS

at 5.5(I) (emphasis added). A detention facility must "permit legal visitation

seven days a week, including holidays," for "a minimum of eight hours per day

on regular business days, and a minimum of four hours per day on weekends

and holidays." *Id.* at 5.5(II)(G)(2). A facility "may not impose or allow

imposition" of certain sanctions, including "deprivation of legal visitation." *Id.*

at 3.1(II)(A)(3).

20. The NDS also recognize the importance of Know Your Rights

presentations, providing that "[f]acilities *shall permit* authorized persons to make

presentations to groups of detainees for the purpose of informing them of U.S.

immigration law and procedures, consistent with the security and orderly

---

[1] ICE, National Detention Standards for Non-Dedicated Facilities (rev. 2019), *available at* https://www.ice.gov/doclib/detention-standards/2019/nds2019.pdf.

operation of each facility." *Id*. at 6.4(I) (emphasis added). Individuals can seek approval from the local ICE Enforcement and Removal Operations ("ERO") office to conduct Know Your Rights presentations. Once approved, "facilities are *required* to coordinate ICE/ERO approved presentations." *Id*. at 6.4(II)(B) (emphasis added). Approved presenters are guaranteed an opportunity to "meet with small groups of detainees to discuss their cases following a group presentation, consistent with security and the orderly operation of the facility." *Id*. at 6.4(II)(G). The standards permit a facility to "temporarily suspend" a Know Your Rights presentation only for four specific reasons: (1) the presentation poses an unreasonable security risk; (2) it interferes substantially with the orderly operation of the facility; (3) it deviates from the approved material, procedures, or presenters; or (4) the facility is operating under emergency conditions.

21.     Either party may cancel the IGSA upon "written notice of intention to terminate the agreement, 120 days in advance of the effective date of formal termination, or the Parties may agree to a shorter period[.]" Ex. 1 at Article IX. Further, ICE has the right to terminate the agreement without the aforementioned notice if BCSO fails to "remedy deficient service," which would include failure to adhere to the NDS. *Id.* at Article X(B); *see also id.* at Article V.

**Plaintiff ACLU of Florida's Investigation into Conditions at Baker**

22.    The ACLU of Florida has long investigated conditions at immigration detention facilities as part of its immigrants' rights work. For years, the organization has received complaints about inhumane conditions and egregious misconduct at Baker. In 2020, for example, the ACLU of Florida filed a lawsuit seeking to force Baker and other detention facilities statewide to implement COVID-19 precautions. In 2021, the ACLU of Florida learned that a Romanian woman detained for immigration purposes had been sexually abused and exploited by a corrections deputy employed by BCSO.

23.    In 2022, the ACLU of Florida began receiving an increasing number of complaints as individuals detained at Baker sought to organize to protect their rights. In February 2022, a group of individuals prepared a complaint that was signed by more than three dozen detained immigrants. The complaint described numerous abuses, including physical assaults and the ongoing failure to implement COVID-19 mitigation measures. Beginning on May 16, 2022, when conditions still had not improved, approximately 100 detained individuals participated in a peaceful hunger strike. Baker's response to the hunger strike was extreme. Upon notice of the immigrants' intent to engage in a hunger strike, multiple individuals reported that BCSO threatened to cut off all access to water if they persisted. Once the hunger strike commenced, BCSO followed through on this threat. BCSO not only removed all drinking water from the housing

units, but also retaliated against individuals by cutting off access to running water, rendering the sinks, showers, and toilets inoperable and allowing feces and other waste to build up and endanger the detained individuals.  BCSO further retaliated by cutting off access to other items such as commissary and the televisions.

24.     In light of the deteriorating conditions and growing concerns about retaliation, the ACLU of Florida made Baker a central focus of its work on immigration detention beginning in May 2022.  In June, ACLU of Florida staff toured the facility and had confidential legal visits with more than a dozen detained individuals.  During the tour led by officials from both BCSO and ICE, ACLU of Florida staff asked questions about a range of issues, including the availability of medical care, the use of force against detained individuals, and the use of solitary confinement.  ACLU of Florida staff also visited three housing units and spoke to several detained individuals who voiced concerns about the conditions, often within earshot of BCSO and ICE officials.

25.     Since that visit, the ACLU of Florida has requested and reviewed the medical records of several individuals and had confidential legal calls with dozens of others.  The ACLU of Florida has also widely circulated the phone number for its Detention Database hotline and encouraged individuals to call the hotline to report any and all instances of misconduct and inhumane conditions at Baker, which many detained immigrants have done.

26.     On July 26, 2022, the ACLU of Florida sent a letter to ICE informing the agency of the emergent and dangerous conditions at Baker and asking for ICE's immediate intervention.[2]  This letter received media coverage, including by local outlets in north Florida.

On August 17, 2022, the ACLU of Florida sent BCSO an extensive public records request seeking detailed information about conditions at Baker, including video surveillance footage, use-of-force reports, solitary confinement records, complaints and grievances filed by detained individuals, and internal documents relating to sanitation, legal visits, medical care, and the facility's response to hunger strikes, among other things.  *See* Ex. 2.  BCSO acknowledged receipt but has not yet provided responsive records.

**Growing Public Outrage About Conditions at Baker**

27.     In July 2022, several advocacy organizations filed a multi-individual complaint with the Office of Civil Rights and Civil Liberties ("CRCL") in the Department of Homeland Security ("DHS").  That office is charged with promoting civil rights and civil liberties by, among other things, investigating civil rights complaints arising from DHS activities (including immigration

---

[2] Letter from Katie Blankenship, ACLU of Florida, to Garrett Ripa, ICE Miami Field Office, Re: Request for Immediate Action at Baker County Detention Facility, July 26, 2022, *available at* https://www.aclufl.org/sites/default/files/field_documents/07.26.2022.ltr_to_ice_re_baker_conditions.kb_1.pdf.

detention), communicating with affected individuals, and "promoting appropriate attention within the Department to their experiences and concerns."[3]

28.     The July 2022 complaint described the "range of abuses" experienced by individuals detained at Baker, including "excessive use of force and physical assaults, extreme medical neglect, racist harassment and targeting, retaliation, impediments to accessing legal counsel, and lack of adequate hygiene, food, or COVID-19 safety measures."[4]  The complaint urged CRCL and the DHS Office of the Inspector General to recommend the permanent termination of the IGSA between ICE and Baker in light of the "extensive evidence that Baker County is unable to safely and responsibly house immigrants in ICE detention in compliance with the National Detention Standards and the United States Constitution."[5]

29.     The complaint drew extensive media coverage.  One headline quoted the complaint's assessment of Baker as "'a living hell' for immigrants," and noted the allegations that "conditions at the Baker detention center place

---

[3] Dep't of Homeland Security, *Office for Civil Rights and Civil Liberties*, https://www.dhs.gov/office-civil-rights-and-civil-liberties.

[4] Immigrant Action Alliance et al., Multi-Individual Complaint re: Baker County Detention Center for Inhumane Conditions – Physical Assault, Medical Neglect, Verbal Abuse, Racialized Harassment and Targeting, COVID-19 Negligence, and Retaliation (July 21, 2022) (hereinafter "IAA et al. Complaint"), *available at* https://tinyurl.com/5xth2x6u.

[5] *Id.*

people's lives in danger."[6]  Another news report highlighted the growing fears of retaliation among individuals who were named or otherwise participated in the complaint.[7]  The media coverage also referenced the July 26, 2022 ACLU of Florida letter to ICE, and the ACLU of Florida's Deputy Legal Director was included in interviews that aired contrasting the ACLU of Florida's allegations with Defendant Rhoden's denial of the same.

30.     Sheriff Scotty Rhoden became personally involved in the response to the CRCL complaint and the ACLU of Florida's allegations of inhumane treatment and conditions.  He granted a local news organization "unprecedented access" to Baker's immigration detention wing and gave an interview seeking to defend the facility against the allegations.  In the interview, Sheriff Rhoden expressed an unwillingness to open the facility to individuals seeking to shed light on potential abuse, stating: "**What I'm not going to do is allow people to come in here and lie about our facility**, the job that our people do here—because we take pride in our job.  I'm not going to stand by and remain silent and not

---

[6] Florida Times-Union, *Federal complaint claims 'a living hell' for immigrants inside ICE's Baker County Detention Center*, First Coast News, July 26, 2022, https://www.firstcoastnews.com/article/news/politics/federal-complaint-ice-baker-county-detention-center-abuse-racial-profiling/77-a5b56ed1-16c1-49e6-8c11-a12e3988c298.

[7] Tarik Minor, *Civil rights groups file complaint alleging 'inhumane conditions' at federal wing of Baker County jail*, News4Jax, July 27, 2022, https://www.news4jax.com/i-team/2022/07/26/civil-rights-groups-file-complaint-alleging-inhumane-conditions-at-federal-wing-of-baker-county-jail/.

vigorously defend what we do here at the Sheriff's Office because our people do a great job here on a day-to-day basis, and I'm going to stand behind that what we do here is right."[8]

31.     The news team interviewed the ACLU of Florida's Deputy Legal Director as well, who reiterated that detained individuals are in fact experiencing the abuses alleged in the federal complaint.  The article further notes that the ACLU of Florida is not only advocating for unannounced inspections, but also considering "legal action against the facility."

**The Creation and Announcement of the Baker Legal Assistance Program**

32.     After visiting Baker in June and voicing concerns about the access-to-counsel issues, the ACLU of Florida began collaborating with three law school clinics and a number of pro bono attorneys to develop the Baker Legal Assistance Program.  The participating clinics are the Florida State University Farmworker and Immigration Rights Clinic, the University of Florida Immigration Clinic, and the University of Miami Immigration Clinic.

33.     In August 2022, the ACLU of Florida and the clinics sent ICE a formal, written request to conduct Know Your Rights presentations and in-

---

[8] Tarik Minor, *I-TEAM given exclusive access by Baker County sheriff to federal wing of jail where immigrant detainees allege 'inhumane conditions'*, News4Jax, Aug. 3, 2022, https://www.news4jax.com/i-team/2022/08/03/i-team-given-exclusive-access-by-baker-county-sheriff-to-federal-wing-of-jail-where-immigrant-detainees-allege-inhumane-conditions/.

person legal interviews at Baker. Ex. 3. The request made clear that the visits would involve "one-on-one conversations between attorneys, legal representatives, and potential clients." *Id.* Because such conversations would be "privileged," the letter asked that space be made available in the law library and pods where private conversations could take place outside the earshot of Baker and ICE officers. *Id.* On August 24, the Assistant Field Office Director of ICE's Miami Field Office informed the clinics that the request had been approved.

34.     The ACLU of Florida and one of the participating clinics, the Florida State University Farmworker and Immigration Rights Clinic ("FSU Clinic"), accordingly made plans to visit Baker on September 9. In addition to a Know Your Rights presentation, the schedule for the visit would include a series of confidential, one-on-one legal interviews to discuss prospective clients' immigration cases and discuss and document complaints about the poor conditions at Baker.

35.     On August 25, Baker's Chaplain and Programs Coordinator, Tommy Richardson, sent an email confirming that ACLU of Florida attorneys, along with FSU Clinic Director Ashley Hamill and nine law students, had been "approved [b]y ICE/ERO for a KYR Presentation" and would be allowed to visit Baker from 8:30am to 5:00pm. Ex. 4.

36.     At ICE's request, the ACLU of Florida and FSU Clinic submitted additional details about their visit for use in an official Stakeholder Tour/Visit

Notification Flyer to be displayed at Baker.  Ex. 5.  The flyer makes clear that the purpose of the visit is to "[p]resent on legal rights and conduct legal screenings" and that the visit would take place in the law library and pods between 8:30 a.m. and 5:00 p.m. on September 9.  *Id.*  The flyer includes a sign-up sheet for detained individuals to indicate they wished to meet with the ACLU of Florida and FSU Clinic during their visit.  Although the organizations completed the flyer and sent it to BCSO officials, it is not clear whether BCSO posted the sign-up sheet as required by the NDS; several detained individuals reported to the ACLU of Florida that BCSO never posted the sign-up sheet.

37.    On September 7, 2022, the ACLU of Florida published on its website a press release announcing the Baker Legal Assistance Program.  The post clearly identified the goals of the program in the very first line of the second paragraph: "The new program will shed light and address the mistreatment of immigrants at the detention center while providing access to counsel for their immigration cases."[9]

---

[9] ACLU of Florida, *Florida University Law Clinics and the ACLU of Florida Launch New Immigration Legal Representation Program at ICE Detention Center*, Sept. 7, 2022,  https://www.aclufl.org/en/press-releases/florida-university-law-clinics-and-aclu-florida-launch-new-immigration-legal#:~:text=The%20new%20program%20will%20shed,counsel%20for%20their%20immigration%20cases.

**Defendants' Abrupt, Unexplained Cancellation of September 9 Legal Visits**

38.     On the morning of September 7—two days before the scheduled

visit—Defendant Evelyn Blue sent an email "postpon[ing]" the visit until further

notice.  Ex. 9 at 2.  She further stated that the visit scheduled for September 30

would be "reevaluated closer to that date."  *Id.*  Defendant Blue provided no

explanation in her email for the abrupt cancellation of the presentation and legal

visits.  Nor did she provide any alternative dates for rescheduling.

39.     ACLU of Florida Deputy Legal Director Katie Blankenship spoke by

phone with Tommy Richardson, who had spoken with Defendant Blue.  He

indicated that the decision was final and that the attorneys and students would

not be allowed in the building.  He also stated that the decision to deny the

group access to the facility had been made by someone "higher up" in the chain

of command and that it was out of Captain's Blue's hands.

40.     Ms. Blankenship subsequently spoke to officials from ICE/ERO,

who suggested that legal visits on Friday would still be possible after all.  They

advised Ms. Blankenship to submit a list of the individuals with whom the group

wished to meet.  Ms. Blankenship accordingly sent a list of individuals to BCSO

officials.

41.     At that point, the communications from BCSO grew openly hostile.

Defendant Randy Crews stated in an email: "This will be the last [email] from

this agency, simply stated there will be no visits tomorrow. Your continuous badgering will not change that." Ex. 6.

42.    Later that day, Defendant Crews sent another email refusing to schedule the legal visits because they were "not [the] original purpose for tomorrow's visit." Ex. 7. That statement is demonstrably false, as the initial request for approval made clear that confidential legal visits would in fact take place and were always part of the planned events for September 9 and all subsequent visits by the Baker Legal Assistance Program.

43.    On the morning of September 9, the attorneys and law students arrived at the facility in person and were denied access by Baker employees. A supervisor informed the group that the facility did not have the space required to conduct legal visits. This, too, was demonstrably false. There are three attorney-client meeting rooms that are clearly visible upon entering the lobby at Baker. At the time of that conversation on September 9, those three attorney-client rooms were visibly unoccupied. The ACLU of Florida and FSU Clinic attorneys and law students remained at Baker for the better part of an hour, and the three attorney-client rooms remained empty the entire time. There were also no other attorneys present at the facility to meet with clients or prospective clients. BCSO officials nonetheless refused to reconsider the decision, even after the attorneys present explained that the denial of access violated the Constitution and the applicable ICE detention standards.

44.     On the afternoon of September 9, the ACLU of Florida sent a demand letter addressed to Defendant Rhoden.  *See* Ex. 10.  The letter explained that the denial of access violated Defendants' obligations under the 2019 NDS and the First and Fourteenth Amendments to the U.S. Constitution.  To date, Defendants have not responded to the demand letter or even acknowledged receipt.

45.     After the September 9 incident, BCSO provided its written policy governing legal visits to an attorney working with the Baker Legal Assistance Program.  *See* Ex. 8.  The policy guarantees detained individuals the opportunity to "meet privately with current or prospective legal representatives and their legal assistants."  *Id.* at 4.  However, it also states that "[a]ll legal visits must be pre-scheduled prior to the visit"; "[w]alk-in visits are not permitted," except in the discretion of the facility administration in emergency situations.  *Id.*  This policy is not posted at the facility or available online.  The policy also conflicts with ICE's instructions for legal visits at Baker, which expressly do not require pre-scheduling for visits during normal visitation hours.  ICE's instruction for Baker states that "[l]egal representatives may visit detainees Monday - Friday from 8:30 a.m. until 8 p.m., and Weekends & holidays from 10 a.m. until 2 p.m."

ICE further instructs attorneys to call ahead only to "coordinate visits *outside* of the 8:30 a.m. until 8 p.m. timeframe."[10]

46.     Just as Defendants' actions on September 9 violated the NDS and the U.S. Constitution, so too does BCSO's policy requiring pre-scheduled legal visits. This policy inhibits detained individuals' ready access to counsel and creates an impediment to legal consultations that could have detrimental impacts on detained individuals' cases and their ability to assert their rights when confronted with abusive or inhumane conditions in detention.  These harms are already evident from Defendants' actions on September 9, as the ACLU of Florida and FSU Clinic intended to meet with several individuals with time-sensitive matters.

47.     One example of the harm resulting from Defendants' actions involves an individual currently represented by the ACLU of Florida regarding his complaints of medical neglect and abuse while detained at Baker.  This individual has an emergent medical issue for which Baker has failed to provide medical care.  Prior to the legal visits scheduled for September 9, the ACLU of Florida learned that his medical condition was rapidly deteriorating, that he was experiencing symptoms emblematic of a serious and life-threatening condition, and that BCSO had placed him in solitary confinement and was denying access

---

[10] ICE, *Baker County Facility*, https://www.ice.gov/detain/detention-facilities/baker-county-facility (emphasis added).

to medical care.  The ACLU of Florida intended to meet with him on September 9 to assess his current medical condition and address these emergent issues. Because the ACLU of Florida was denied access to this client, he continues to suffer from medical neglect, his condition continues to deteriorate, and the ACLU of Florida has been inhibited from taking all necessary steps to address this harm.

48.     The other members of the Baker Legal Assistance Program intended to meet with several individuals on September 9 who had proceedings in their immigration cases the following week.  These attorneys and law students planned on conducting in-depth case assessments and taking on any clients with time sensitive, meritorious cases.  Because the Program was denied access to the facility, these prospective clients were denied access to counsel and many were forced to appear in proceedings the following week without representation. Upon information and belief, several of these individuals lost their hearings after having no choice but to appear pro se without the benefit of counsel.

**Subsequent Developments**

49.     As noted, the Baker Legal Assistance Program previously obtained approval for another participating clinic—the University of Miami Immigration Clinic—to visit Baker on September 30, 2022.  On September 21, the Program sent a letter to ICE and BCSO seeking confirmation that the visit would proceed as planned and explaining that attorneys from the ACLU of Florida would be

joining the visit since they had been unable to speak with clients and prospective clients on September 9. Tommy Richardson at BCSO sent an email confirming the visit. However, he sent a similar confirmation of the September 9 visit that was ultimately canceled, and it is likely that Defendants will repeat their actions leading up to the September 9 visit—*i.e.*, canceling the events at the last minute and refusing access to attorneys for one-on-one legal visits. Due to the Defendants' actions regarding the September 9 visit, including the hostile email from Defendant Crews, the ACLU of Florida believes that Defendants will not adhere to their obligations to ensure access to counsel without this Court's intervention.

50. In addition, Defendant Blue's express statement that the September 30 visit would be "reevaluated closer to the date" (Ex. 9) underscores that it is unlikely Defendants will ultimately allow the visit to proceed.

51. In-person legal visits are critical for multiple reasons, particularly at Baker. Most importantly, it is the only way attorneys can guarantee their conversations with detained individuals are confidential; the only alternative BCSO provides is to speak to individuals by phone in the law library, where a guard is regularly stationed and easily able to overhear the conversation. Confidentiality is essential to the relationship between attorneys and clients or prospective clients—particularly in sensitive cases involving, for example, alleged misconduct by officers or requests for asylum. Further, the ACLU of

Florida and clinics have time-sensitive documents that clients and prospective clients need to review and sign with counsel—an impossibility over the telephone.

52.     The ACLU of Florida will experience significant irreparable harm if Defendants again deny the Baker Legal Assistance Program access to the facility. A primary objective of the organization is to protect the individuals detained at Baker by advocating for the termination of the facility's contract if necessary or, at minimum, for dramatic improvements in the conditions of confinement. The ACLU of Florida cannot accomplish that objective without the ability to have confidential, in-person legal visits with detained individuals—many of whom need emergency medical interventions or other urgent assistance.

53.     The individuals detained at Baker will also experience substantial irreparable harm if they cannot meet with the members of the Baker Legal Assistance Program. Many have bond and/or other immigration hearings scheduled in the near future, and they are considerably more likely to be released on bond and to prevail on their claims if they are represented by counsel at those hearings. In addition, as noted, several individuals have meritorious complaints about egregious conditions at Baker, which require immediate attention and are unlikely to be resolved without the involvement of civil rights lawyers.

# CLAIMS FOR RELIEF

## COUNT I

### Violation of Plaintiff's First Amendment Right to Free Speech

54.     Plaintiff incorporates by reference paragraphs 1 through 53 as if set forth in full herein.

55.     The First Amendment, as applied to state and local government agencies and officials by the Fourteenth Amendment, prohibits governmental entities from "abridging the freedom of speech."  U.S. Const. Amend. I.

56.     Plaintiff has a right to free speech under the First Amendment, which includes the right to speak to clients, prospective clients, and witnesses about their legal rights and about potential civil rights claims.  *See, e.g.*, *In re Primus*, 436 U.S. 412, 423-26, 431 (1978); *NAACP v. Button*, 371 U.S. 415, 428-30 (1963).

57.     Plaintiff's First Amendment right to free speech extends to communications with prospective clients who are in detention.  *See Thornburgh v. Abbott*, 490 U.S. 401, 407-08 (1989) (those who wish to communicate with prisoners "have a legitimate First Amendment interest in access to prisoners"); *Procunier v. Martinez*, 416 U.S. 396, 408-09 (1974) (both incarcerated individuals and those with whom they correspond have First Amendment rights that can be infringed by unjustified government interference), *overruled in part on other grounds by Thornburgh*, 490 U.S. 401.

58.     Defendant denied the ACLU of Florida and affiliated individuals access to prospective clients and witnesses who could shed light on potential constitutional violations at Baker.  By doing so, Defendant interfered with the organization's ability to carry out a core component of its public interest mission—namely, to protect and defend the rights of detained individuals. Defendant accordingly violated the ACLU of Florida's First Amendment right to freedom of speech and expression.

59.     Upon information and belief, Baker denied access to the ACLU of Florida based on the content or viewpoints it presumes will be expressed during its conversations with detained individuals.  Accordingly, Defendants' conduct also amounts to unconstitutional content and viewpoint discrimination in violation of the First Amendment.  *See Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 829 (1995).

## COUNT II

### Violation of Plaintiff's First Amendment Rights – Retaliation

60.     Plaintiff incorporates by reference paragraphs 1 through 53 as if set forth in full herein.

61.     The First Amendment prohibits the government from retaliating against individuals and organizations based on their protected activity.  A First Amendment retaliation claim "requires that a plaintiff must establish first, that his speech or act was constitutionally protected; second, that the defendants'

retaliatory conduct adversely affected the protected speech; and third, that there is a causal connection between the retaliatory actions and the adverse effect on speech." *Bennett v. Hendrix*, 423 F.3d 1247, 1250 (11th Cir. 2005).

62. Plaintiff ACLU of Florida has engaged in constitutionally protected activity by, among other things, publicly advocating for the improvement of conditions at Baker and the termination of the agreement between ICE and BCSO. Plaintiff has also engaged in protected activity by meeting with clients and prospective clients detained at Baker, advising them about their rights, and providing information about potential avenues for seeking redress for those violations, including potential constitutional violations experienced while in detention at Baker. *See NAACP*, 371 U.S. at 434.

63. Defendants have taken adverse action against the ACLU of Florida by abruptly canceling pre-scheduled, pre-approved legal visits at Baker with no explanation. A defendant takes "adverse action" when its "conduct would likely deter 'a person of ordinary firmness' from the exercise of First Amendment rights." *Bennett*, 423 F.3d at 1250 (quoting *Constantine v. Rectors and Visitors of George Mason Univ.*, 411 F.3d 474, 500 (4th Cir. 2005)). By depriving the ACLU of Florida of access to clients, prospective clients, and sources of information, Defendants have significantly interfered with the organization's ability to carry out its mission of protecting the rights of detained individuals.

64.     There is a causal connection between the ACLU of Florida's protected activity and Defendants' adverse actions.  Defendants specifically targeted two visits planned by the Baker Legal Assistance Program—a program coordinated by the ACLU of Florida not only to improve access to counsel for detained immigrants, but also to hold Baker accountable for abusive conditions.  Defendants had knowledge of the ACLU of Florida's constitutionally protected activity, including its intent to inform detained immigrants of their legal rights, its ongoing efforts to gather information about potential constitutional violations, and its public advocacy for improved conditions at the facility.  *See Farrow v. West*, 320 F.3d 1235, 1248 (11th Cir. 2003).  Defendants canceled these visits within days of the ACLU of Florida's constitutionally protected activity, which strongly supports an inference of causation.  *See Brungart v. BellSouth Telecommc'ns, Inc.*, 231 F.3d 791, 799 (11th Cir. 2000).  Finally, Defendants appear to have exclusively denied access to the ACLU of Florida and others known by BCSO to be affiliated with the ACLU of Florida.  BCSO employees' own statements indicate that the facility was open to other attorneys on September 9, 2022; they claimed they denied access to the ACLU of Florida and FSU Clinic because they did not have room on their schedule that day for *additional* legal visits.  As explained, this statement appears to be untrue as the attorney-client meeting rooms were visibly unoccupied that morning.  However, the statement is clear evidence that Baker was not closed for legal visitation in general that day.

It was only the ACLU of Florida and other members of the Baker Legal Assistance Program who were excluded and prevented from meeting with clients and prospective clients. The selective denial of access without any justification is persuasive evidence of retaliation.

65.     Accordingly, the Court should declare that Defendants' denial of access to ACLU of Florida attorneys constitutes retaliation in violation of the First Amendment.

## COUNT III

### Violation of First Amendment Rights – Free Speech
### (Brought on Behalf of Detained Clients and Prospective Clients)

66.     Plaintiff incorporates by reference paragraphs 1 through 53 as if set forth in full herein.

67.     "[T]he First Amendment protects the right of an individual or group to consult with an attorney on any legal matter." *Denius v. Dunlap*, 209 F.3d 944, 954 (7th Cir. 2000); *see also DeLoach v. Bevers*, 922 F.2d 618, 620 (10th Cir. 1990) ("The right to retain and consult with an attorney . . . implicates not only the Sixth Amendment but also clearly established First Amendment rights of association and free speech.").

68.     The individuals detained at Baker have a First Amendment right to speak with attorneys about prospective legal claims. *See, e.g., Procunier*, 416 U.S. at 408-09 (recognizing the First Amendment rights of incarcerated individuals to

communicate with people outside of prison walls); *cf. Mitchell v. Peoples*, 10 F.4th 1226, 1229-31 (11th Cir. 2021) (a facility violates a detained person's right to free speech by engaging in conduct that undermines the confidentiality of attorney-client communications).

69.     Defendants denied detained individuals—many of whom have upcoming immigration hearings and/or need urgent attention to medical issues or other conditions of confinement—the ability to meet with attorneys who could potentially represent them in legal proceedings and assist them in asserting their constitutional rights.  Defendants accordingly violated these individuals' rights to freedom of speech and expression.

70.     Upon information and belief, Defendants denied these individuals the ability to speak with Plaintiff and other attorneys based on the content or viewpoints Defendants presume will be expressed during such conversations. Accordingly, Defendants' conduct also amounts to unconstitutional content and viewpoint discrimination in violation of the First Amendment.  *See Rosenberger*, 515 U.S. at 819.

## COUNT IV

**Violation of First Amendment Rights – Retaliation**
**(Brought on Behalf of Detained Clients and Prospective Clients)**

71.     Plaintiff incorporates by reference paragraphs 1 through 53 as if set forth in full herein.

72.     As noted, the First Amendment prohibits the government from retaliating against individuals and organizations based on their protected activity.  Corrections officials may not retaliate against detained individuals for filing grievances or otherwise reporting complaints about the conditions of their confinement.  *See Boxer X v. Harris*, 437 F.3d 1107, 1112 (11th Cir. 2006) ("First Amendment rights to free speech and to petition the government for a redress of grievances are violated when a prisoner is punished for filing a grievance concerning the conditions of his imprisonment.").

73.     Plaintiff's clients and prospective clients at Baker engaged in protected activity by reporting abusive conditions to ACLU of Florida attorneys with the hope of vindicating their constitutional rights and holding BCSO officials accountable for their misconduct.

74.     Defendants have taken adverse action against the ACLU of Florida's clients and prospective clients by canceling the pre-scheduled, pre-approved Know Your Rights presentation and eliminating the opportunity for one-on-one legal visits with potential counsel.  The cancellation of these visits substantially impairs the ability of Plaintiff's clients and prospective clients to vindicate their constitutional rights.

75.     There is a causal connection between the protected activity of Plaintiff's clients and prospective clients and Defendants' adverse actions. Defendants had knowledge of those individuals' constitutionally protected

activity; they are well aware that immigrants detained at the facility have been speaking with ACLU of Florida attorneys for months about the abusive conditions they have experienced. BCSO officials were physically present during conversations between ACLU of Florida staff and detained individuals during the June 2022 tour of Baker, and BCSO can also identify the individuals with whom ACLU of Florida attorneys have arranged confidential legal calls in subsequent months. Moreover, several detained individuals have been named publicly in connection with their complaints about Baker, including in the CRCL complaint to which Defendant Rhoden mounted a public response. There is close temporal proximity between these individuals' constitutionally protected activity and Defendants' decision to deny them access to counsel, which strongly supports an inference of causation. *See Brungart*, 231 F.3d at 799.

76. Accordingly, the Court should declare that Defendants' refusal to permit Plaintiff's clients and prospective clients to meet with ACLU of Florida attorneys constitutes retaliation in violation of the First Amendment.

## COUNT V

**Denial of Right of Access to the Courts in Violation of Fourteenth Amendment (Brought on Behalf of Detained Clients and Prospective Clients)**

77. Plaintiff incorporates by reference paragraphs 1 through 53 as if set forth in full herein.

78.     The Constitution guarantees detained individuals the right to access the courts in order to "present claimed violations of fundamental constitutional rights." *Bounds v. Smith*, 430 U.S. 817, 825 (1977); *Bill Johnson's Rests., Inc. v. NLRB*, 461 U.S. 731, 741 (1983) ("[T]he right of access to the courts is an aspect of the First Amendment right to petition the Government for redress of grievances."); *Wright v. Newsome*, 795 F.2d 964, 968 (11th Cir. 1986) (per curiam) ("Prison officials may not deny or obstruct an inmate's access to the courts."). This right extends to individuals detained in immigration custody. *See Orantes-Hernandez v. Meese*, 685 F. Supp. 1488, 1510 (C.D. Cal. 1988) (individuals detained for immigration enjoy fundamental right of access to the courts).

79.     This right of access includes the right to communicate with lawyers about potential civil rights claims. *See, e.g.*, *Wolff v. McDonnell*, 418 U.S. 539, 579 (1974) (recognizing that prisoners' fundamental rights "would be diluted" if incarcerated individuals were prohibited from "seek[ing] help" in bringing civil rights actions as well as challenges to criminal convictions).

80.     The ACLU of Florida's clients and potential clients suffered significant injuries based on Defendants' impediment to their access to the courts, such as the denial of a fair hearing with the benefit of counsel and the inability to meet with attorneys to discuss ongoing and emergent constitutional violations such as inhumane treatment and deliberate indifference while in BCSO custody. The likelihood that Defendants will cancel upcoming visits of the

Baker Legal Assistance Program after "reevaluating" them further exacerbates these concerns.

81.     The ACLU of Florida is actively investigating systemic constitutional violations at Baker. Without access to counsel, detained individuals would be unable to pursue constitutional challenges to the conditions of their confinement. By precluding confidential visits with lawyers who have spent months investigating the conditions at the facility, Defendants have directly interfered with these individuals' ability to present their potential claims to the courts.

## COUNT VI

### Denial of Right to Counsel in Violation of Fourteenth Amendment (Brought on Behalf of Detained Clients and Prospective Clients)

82.     Plaintiff incorporates by reference paragraphs 1 through 53 as if set forth in full herein.

83.     Individuals detained for immigration proceedings have a due process right to the effective assistance of counsel. *See Dakane v. U.S. Atty. Gen.*, 399 F.3d 1269, 1273 (11th Cir. 2005).

84.     Plaintiff's detained clients and prospective clients sought to meet with representatives of the Baker Legal Assistance Program in order to discuss potential representation in their pending immigration cases and potential constitutional challenges to the conditions of their confinement.

85.     Defendants' cancellation of the September 9 visit of the Baker Legal Assistance Program directly impeded the ability of Plaintiff and other members of the Program to provide such legal representation, thus denying Plaintiff's clients and prospective clients the effective assistance of counsel guaranteed by the Due Process Clause.

## COUNT VI

### Denial of Substantive Due Process in Violation of Fourteenth Amendment
### (Brought on Behalf of Detained Clients and Prospective Clients)

86.     Plaintiff incorporates by reference paragraphs 1 through 53 as if set forth in full herein.

87.     The Due Process Clause prohibits imprisoning civil detainees in conditions that rise to the level of punishment. *See Youngberg v. Romeo*, 457 U.S. 307, 322 (1982). Conditions of confinement that are expressly intended to punish, that are not reasonably related to a legitimate governmental objective, and/or that are excessive in relation to that objective constitute punishment of civil detainees in violation of the Due Process Clause. *See Southern Poverty Law Center v. Dep't of Homeland Security*, No. 18-760, 2020 WL 3265533, at *18-19, *28-31 (D.D.C. June 17, 2020).

88.     Upon information and belief, individuals held in criminal custody at the Baker County Detention Center have not faced similar impediments when

seeking to access legal representation.  Upon information and belief, Defendants have not categorically refused to permit access to criminal defense attorneys seeking to speak with clients or prospective clients or canceled pre-approved, pre-scheduled legal visits.

89.    Defendants' refusal to permit detained individuals to meet with ACLU of Florida attorneys is expressly intended to punish individuals in civil detention and it subjects individuals in civil detention to more punitive conditions than those under which persons accused or convicted of crimes are confined.  Defendants' conduct is not reasonably related to any legitimate governmental objective and therefore violates the Due Process Clause.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff ACLU of Florida, on behalf of itself, its employees, and its current and prospective clients, requests that the Court grant judgment in its favor on all claims and grant the following relief:

a.    Declare that Defendants' conduct described herein violates Plaintiff's and its clients and prospective clients' rights under the First and Fourteenth Amendments to the U.S. Constitution;

b.    Preliminarily and permanently enjoin Defendants, their subordinates, agents, employees, and all others acting in concert with them from subjecting Plaintiff and its clients and prospective clients to the unlawful acts described herein;

c.      Award appropriate compensatory, punitive, and nominal damages;

d.      Award reasonable attorney's fees, costs, and interest;

e.      Grant any other relief the Court deems just and proper.


Dated:  September 26, 2022        Respectfully submitted,

*/s/ Katherine H. Blankenship*
Katherine H. Blankenship (FBN 1031234)
Janine M. Lopez (FBN 1038560)*
Daniel B. Tilley (FBN 102882)
ACLU Foundation of Florida, Inc.
4343 West Flagler Street, Suite 400
Miami, FL 33134
Tel:  (786) 363-2700
kblankenship@aclufl.org
jlopez@aclufl.org
dtilley@aclufl.org

Amien Kacou (FBN 44302)
ACLU Foundation of Florida, Inc.
4023 N. Armenia Avenue, Suite 450
Tampa, FL 33607
Tel:  (813) 288-8390
akacou@aclufl.org

*Attorneys for Plaintiff*

*\*Application for admission pending*

.