# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# JACKSONVILLE DIVISION

AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF FLORIDA, INC., and

JOSE LUIS MEJIA ENCARNACION,

                *Plaintiffs,*

    v.

Case No. 3:22-cv-1044

SCOTTY RHODEN, Sheriff, in his official and
individual capacities;

RANDY CREWS, Undersheriff, in his
individual capacity;

EVELYN BLUE, Captain, Corrections Division,
in her individual capacity; and

BAKER COUNTY CORRECTIONS
MANAGEMENT CORPORATION;

                *Defendants.*

## FIRST AMENDED COMPLAINT

1.     For the past several months, Plaintiff American Civil Liberties Union

Foundation of Florida, Inc. ("ACLU of Florida") has been investigating

allegations of egregious constitutional violations at the Baker County Detention

Center ("Baker") in Macclenny, Florida.  ACLU of Florida attorneys and volunteers have conducted dozens of legal interviews with detained immigrants who have experienced a range of abuses, including physical assault, retaliation, and the denial of basic medical care.  The ACLU of Florida has publicly denounced the conditions at Baker and put forth substantial evidence that the facility is unable to safely and responsibly care for immigrants in U.S. Immigration and Customs Enforcement ("ICE") custody.  Accordingly, the ACLU of Florida has advocated not only for a federal investigation into the facility, but also for the termination of the contract that allows the Baker County Sheriff's Office ("BCSO") to detain immigrants in the first place.

2.      The ACLU of Florida has also developed an innovative partnership with law school clinics and pro bono attorneys to achieve two critical goals: (i) improving the historically limited access to legal representation for immigrants detained at Baker and (ii) ensuring that individuals are able to timely inform the ACLU of Florida about abuses and inhumane conditions as those issues arise. Participants in this program, known as the Baker Legal Assistance Program, obtained approval from ICE and BCSO to make three trips to Baker in September and October 2022.  Each visit would include a Know Your Rights presentation

and a number of confidential, one-on-one legal screenings and visits to assess

prospective clients' immigration cases, meet with existing clients, and document

complaints about conditions at the facility.

3.    As the date of the first scheduled visit approached, public scrutiny

of Baker continued to increase.  Numerous advocacy organizations filed an

administrative civil rights complaint in July 2022 that vividly illustrated the

worsening conditions at Baker and led to significant media coverage of the

allegations.  Defendant Scotty Rhoden, the Baker County Sheriff, became

personally involved in the response.  He took the unusual step of inviting a local

news organization to film inside Baker and announced that he was "not going to

. . . allow people to come in here and lie about our facility" during an interview

in early August 2022.  The news team interviewed the ACLU of Florida's Deputy

Legal Director as well, who reiterated that detained individuals are in fact

experiencing the abuses alleged in the administrative complaint.  The article

further noted that the ACLU of Florida was not only advocating for

unannounced inspections, but also considering "legal action against the facility."

4.    A few weeks later, Defendants abruptly canceled the Baker Legal

Assistance Program's pre-approved visit to Baker—the ACLU of Florida's first

3

scheduled visit since publicly criticizing conditions at the facility. On the morning of September 7—two days before the scheduled visit—Defendant Evelyn Blue sent an email "postpon[ing]" the visit until further notice. She further stated that the Program's visit scheduled for September 30 would be "reevaluated closer to that date." She provided no explanation in her email for the last-minute cancellation. Nor did any official provide any explanation in subsequent communications over the next two days.

5.    On the morning of September 9, 2022, the attorneys and law students arrived at the facility in person to meet with clients and prospective clients and were turned away. As a result, detained immigrants with imminent bond and immigration hearings lost the ability to potentially obtain representation, and many others missed the opportunity to speak confidentially with counsel about abusive—and in some cases emergent—conditions of confinement.

6.    The denial of access to Baker on September 9 reflects a broader pattern. BCSO consistently impedes detained individuals' access to counsel by refusing to permit confidential legal phone calls and by interfering with privileged and confidential legal mail. As explained in more detail below, BCSO

has recently adopted a policy of categorically refusing to schedule any legal calls. And before that policy took effect, BSCO stationed an officer in the law library where all scheduled legal calls took place, precluding confidential conversations with counsel.

7.    BCSO has also instituted a policy that precludes the delivery of legal mail to detained individuals unless the attorney who sent the legal mail also sends a verification email to the facility.  BCSO has failed to make this policy publicly available to attorneys, resulting in repeated instances of returned legal mail.  Finally, BCSO has a pattern and practice of opening legal mail outside the presence of detained immigrants.

8.    BCSO has also continued to impede the work of the Baker Legal Assistance Program.  The facility refused to timely reschedule the Program's two canceled visits, rejecting proposed dates with no explanation.

9.    Defendants' actions, policies, and practices violate the fundamental constitutional rights of the ACLU of Florida and its clients and prospective clients at Baker.  By denying access to the facility on September 9, Defendants violated their First Amendment rights to free speech and association. Defendants similarly violated the First Amendment by adopting and

implementing policies and practices that preclude confidential attorney-client communications.

10.    Plaintiff Jose Luis Mejia Encarnacion is a lawful permanent resident who has been held at Baker for nearly a year while he challenges his deportation order and detention.  Mr. Mejia Encarnacion has routinely been forced to speak with his attorneys within earshot of BCSO employees and other detained individuals.  And on multiple occasions in recent months, he has had legal mail either opened outside of his presence or returned to his attorney due to the lack of a verification email.

11.    Defendants' actions, policies, and practices regarding access to counsel are unconstitutional in their own right.  But Defendants have further violated the First Amendment by implementing certain policies and practices in order to retaliate against the ACLU of Florida and detained individuals for engaging in protected speech.  Defendants, for example, flatly denied the ACLU of Florida access to Baker shortly after the organization escalated its public criticism and sought extensive public records about abusive conditions at the facility.  And Defendants adopted the new policy of refusing to schedule any

legal calls only after the ACLU of Florida filed this lawsuit challenging barriers to access to counsel at Baker.

12.    Defendants' actions, policies, and practices cause grave harm to both the ACLU of Florida and to the immigrants detained at Baker.  A central aspect of the ACLU of Florida's work is protecting and defending the rights of individuals detained in immigration custody.  Defendants' denial of access to clients and prospective clients at Baker and unlawful hindrance of attorney-client communications impedes the organization's ability to achieve that mission.  The ACLU of Florida must have the ability to meet and communicate confidentially with individuals who report abusive or inhumane conditions while in ICE custody in order to investigate their complaints, advocate for their rights, and zealously pursue legal action.  Defendants' denial of access to the facility and their ongoing restrictions on attorney-client communications directly and egregiously inhibit the ACLU of Florida's work and constitute retaliation in violation of the First Amendment.

13.    Defendants' actions, policies, and practices also cause substantial harm to the detained immigrants, including but not limited to Mr. Mejia Encarnacion, who depend on counsel to seek release from detention, to navigate

complex proceedings, and to raise challenges to inhumane conditions of confinement. The denial of access on September 9, the refusal to reschedule additional in-person presentations and visits, and the inability to engage in confidential communications make it less likely that individuals can obtain the representation they need. And even when they do obtain counsel, Defendants' policies and practices significantly impair the attorney-client relationship and diminish their ultimate likelihood of success.

## JURISDICTION AND VENUE

14. This action to vindicate First Amendment rights is brought under 42 U.S.C. § 1983. This Court has subject matter jurisdiction under Article III of the U.S. Constitution and 28 U.S.C. § 1331.

15. This Court has jurisdiction to enter declaratory and injunctive relief to recognize and remedy the underlying constitutional and legal violations under 28 U.S.C. §§ 2201 and 2202 (declaratory relief) and the Court's inherent equitable powers.

16. Venue lies in the United States District Court for the Middle District of Florida because Defendants reside in this district and because a substantial

part of the events or omissions giving rise to Plaintiffs' claims occurred in this district.  28 U.S.C. § 1391(b)(1), (2).

## PARTIES

17.    Plaintiff ACLU of Florida is a 501(c)(3) nonprofit, nonpartisan organization committed to protecting, defending, strengthening, and promoting the constitutional rights and liberties of all people in Florida.  As part of its immigrants' rights work, the ACLU of Florida routinely seeks legal relief on behalf of detained immigrants.  In particular, the ACLU of Florida has filed numerous challenges to the conditions of confinement in immigration detention facilities.

18.    Plaintiff Jose Luis Mejia Encarnacion is a lawful permanent resident from the Dominican Republic who is currently detained at the Baker County Detention Center in Macclenny, Florida.  He has been detained at Baker for approximately 11 months.

19.    Defendant Scotty Rhoden is the Sheriff of Baker County.  He is the chief law enforcement official in Baker County and the final policymaker for the Baker County Sheriff's Office.  He has direct authority over the Baker County

Detention Center.   Plaintiffs are suing Defendant Rhoden in his official and individual capacities.

20.     Defendant Randy Crews is the Undersheriff of Baker County.  His responsibilities include providing administrative and management assistance to the Sheriff; establishing, coordinating, and implementing departmental policies and procedures; and ensuring compliance with federal, state, and local laws. Plaintiffs are suing Defendant Crews in his individual capacity.

21.     Defendant Evelyn Blue is the Captain of the Corrections Division of the Baker County Sheriff's Office.  Defendant Blue is responsible for day-to-day operations, personnel, facilities, and programs within the Baker County Detention Center.  Plaintiffs are suing Defendant Blue in her individual capacity.

22.     All three individual defendants were at all relevant times, and still are, acting under color of state law.

23.     Defendant Baker County Corrections Management Corporation ("BCCMC") is a Florida nonprofit corporation headquartered in Baker County, Florida.  The BCCMC board is appointed by the Baker County Board of County Commissioners.  BCCMC owns the Baker County Detention Center and is responsible for the facility's operations and management.

## STATEMENT OF FACTS

I.    **Immigration Detention at the Baker County Detention Center**

    A.    **The Agreement Between ICE and the Baker County Sheriff's Office**

24.    In August 2009, BCSO and ICE entered into an Intergovernmental Service Agreement ("IGSA") to house people in immigration detention at the newly constructed Baker County Detention Center.

25.    The IGSA requires ICE to pay BCSO a fixed amount per detained individual per day—an amount described in the contract as the "detainee day rate."

26.    In exchange, BCSO must provide detained individuals with "safekeeping, housing, subsistence, medical and other services."

27.    BCSO is contractually "required to house detainees and perform related detention services in accordance with the most current edition of ICE National Detention Standards"—presently, the 2019 NDS.[1]

28.    Either party may cancel the IGSA upon "written notice of intention to terminate the agreement, 120 days in advance of the effective date of formal

---

[1] ICE, National Detention Standards for Non-Dedicated Facilities (rev. 2019), *available at* https://www.ice.gov/doclib/detention-standards/2019/nds2019.pdf.

termination, or the Parties may agree to a shorter period."  Further, ICE has the right to terminate the agreement without such notice if BCSO fails to "remedy deficient service," which would include failure to adhere to the NDS.

**B.    ICE's Detention Standards Governing Access to Counsel**

29.    The 2019 NDS govern all aspects of immigration detention, including access to counsel, in-person legal visits, Know Your Rights presentations, and legal mail.

30.    As particularly relevant here, the 2019 NDS require that "[f]acilities shall allow detainees to meet privately with their current or prospective legal representatives and legal assistants."  2019 NDS at 5.5(I).  A detention facility must "permit legal visitation seven days a week, including holidays," for "a minimum of eight hours per day on regular business days, and a minimum of four hours per day on weekends and holidays."  *Id.* at 5.5(II)(G)(2).

31.    A facility "may not impose or allow imposition" of certain sanctions, including "deprivation of legal visitation [or] legal mail."  *Id.* at 3.1(II)(A)(3).

32.    The NDS also recognize the importance of Know Your Rights presentations, providing that "[f]acilities shall permit authorized persons to make presentations to groups of detainees for the purpose of informing them of

U.S. immigration law and procedures, consistent with the security and orderly operation of each facility." *Id*. at 6.4(I). Individuals can seek approval from the local ICE Enforcement and Removal Operations ("ERO") office to conduct a Know Your Rights presentation. Once approved, "facilities are *required* to coordinate ICE/ERO approved presentations." *Id*. at 6.4(II)(B) (emphasis added).

33. Approved Know Your Rights presenters are guaranteed the opportunity to "meet with small groups of detainees to discuss their cases following a group presentation, consistent with security and the orderly operation of the facility." *Id*. at 6.4(II)(G).

34. A facility may "temporarily suspend" a Know Your Rights presentation only for four specific reasons: (1) the presentation poses an unreasonable security risk; (2) it interferes substantially with the orderly operation of the facility; (3) it deviates from the approved material, procedures, or presenters; or (4) the facility is operating under emergency conditions. *Id*. at 6.4(II)(H).

35. As noted, the NDS are incorporated into the IGSA and therefore impose contractual obligations on BCSO.

**C.    BCSO's Agreement with BCCMC**

36.    As the owner of the Baker County Detention Center, BCCMC is ultimately responsible for its operation, maintenance, and management.

37.    Federal tax returns filed by BCCMC indicate that the corporation itself "operate[s]" the facility.

38.    BCCMC and BCSO have entered into an operational, management, and maintenance agreement that delegates authority to BCSO to operate the facility.  The agreement requires BCSO to operate the facility in accordance with all "Required Standards."  "Required Standards" include standards that are "reasonably necessary to satisfy at all times any rules, procedures, regulations, court orders or contract terms of any Prisoner Transfer Source [e.g., ICE]." Accordingly, this agreement also requires BCSO to operate Baker in accordance with the NDS, as compliance with the NDS is a term of the contract between ICE and BCSO.

39.    BCCMC retains the right to monitor the facility through inspections and audits of operating records.

40.    BCCMC retains the authority to intervene upon determining that BCSO "is not operating and/or maintaining [Baker]" in accordance with the

Required Standards, including the NDS.  After providing BCSO with a notice of the breach or violation, BCCMC may "take any and all such acts reasonably necessary to cure such breach" and may ultimately terminate the contract if the breach is not cured.  BCCMC also retains the right to terminate the agreement without cause so long as it provides 120 days' notice to BCSO.

## II.    THE ACLU OF FLORIDA'S INVESTIGATION INTO CONDITIONS AT BAKER AND DEFENDANTS' RESPONSE

### A.    The ACLU of Florida's Investigation into Baker

41.     The ACLU of Florida has long investigated conditions of confinement at immigration detention facilities as part of its immigrants' rights work.

42.     For years, the organization has received reports about inhumane conditions and egregious misconduct at Baker.  In 2020, for example, the ACLU of Florida filed a lawsuit seeking to compel Baker and other detention facilities statewide to implement COVID-19 precautions.  In 2021, the ACLU of Florida learned that a Romanian woman detained for immigration purposes had allegedly been sexually abused and exploited by a corrections deputy employed by BCSO.

43.    In 2022, the ACLU of Florida began receiving an increasing number of reports of inhumane conditions as individuals detained at Baker sought to organize to protect their rights.

44.    In February 2022, a group of individuals prepared an administrative complaint entitled "Emergency Petition for Proper and Humane Treatment of ICE Civil Detainees at Baker County Detention Center." The petition was signed by more than three dozen detained immigrants, including Mr. Mejia Encarnacion. It described numerous abuses at Baker, including physical assaults, retaliation, unlawful use of solitary confinement, medical neglect, and the ongoing failure to implement COVID-19 mitigation measures.

45.    Beginning on May 16, 2022, when conditions still had not improved, approximately 100 detained individuals participated in a peaceful hunger strike. Baker's response to the hunger strike was extreme. Multiple individuals reported that upon receiving notice of the immigrants' intent to engage in a hunger strike, BCSO threatened to cut off all access to water if they persisted. Once the hunger strike commenced, BCSO followed through on this threat. BCSO not only removed all drinking water from the housing units, but also retaliated against individuals by cutting off access to running water, rendering

16

the sinks, showers, and toilets inoperable and allowing feces and other waste to build up and endanger their health and safety. BCSO further retaliated by cutting off access and threatening to cut off access to other items such as commissary and the televisions.

46.    In addition to signing the emergency petition and participating in a hunger strike, Mr. Mejia Encarnacion sent an administrative complaint in May 2022 reporting that a BCSO official had entered his cell during count and taken his legal documents and raising concerns about retaliation.

47.    In light of the deteriorating conditions and growing fears of retaliation, the ACLU of Florida made Baker a central focus of its work on immigration detention beginning in May 2022. In June, ACLU of Florida staff toured the facility and had confidential legal visits with more than a dozen detained individuals, including Mr. Mejia Encarnacion. During the tour led by officials from both BCSO and ICE, ACLU of Florida staff asked questions about a range of issues, including the availability of medical care, the use of force against detained individuals, and the use of solitary confinement. ACLU of Florida staff also visited three housing units and spoke to several detained individuals who

voiced concerns about the conditions, often within earshot of BCSO and ICE officials.

48.    Since that visit, the ACLU of Florida has requested and reviewed the medical records of many individuals and had confidential legal calls with dozens of others.  The ACLU of Florida has also widely circulated the phone number for its Florida Detention Database hotline and encouraged individuals to call the hotline to report any and all instances of misconduct and inhumane conditions at Baker, which many detained immigrants have done and continue to do.

**B.    The ACLU of Florida's Public Advocacy Regarding Baker**

49.    On July 26, 2022, the ACLU of Florida sent a letter to ICE informing the agency of the emergent and dangerous conditions at Baker and asking for ICE's immediate intervention.[2]  This letter received media coverage, including by local outlets in north Florida.

50.    On August 17, 2022, the ACLU of Florida sent BCSO an extensive public records request seeking detailed information about conditions at Baker, including video surveillance footage, use-of-force reports, solitary confinement records, complaints and grievances filed by detained individuals, and internal

---

[2] Letter from Katie Blankenship, Deputy Legal Director for the ACLU of Florida, to Garrett Ripa, ICE Miami Field Office, Re: Request for Immediate Action at Baker County Detention Facility, July 26, 2022, *available at* https://tinyurl.com/bdzsne4f.

documents relating to sanitation, legal visits, medical care, and the facility's

response to hunger strikes, among other things.

51.    At a public meeting of the BCCMC board of directors on August 18,

2022, Defendant Crews criticized the ACLU of Florida's advocacy efforts, along

with its public records request and the amount of work it would take to

respond.[3]

52.    To date, BCSO has not provided any records in response to the

ACLU of Florida's request.  The ACLU of Florida has informed BCSO that it

intends to pursue legal action if it does not receive records responsive to its

request.

C.    **Defendants React to Growing Public Outrage About Conditions at Baker**

53.    In July 2022, several advocacy organizations filed a multi-individual

administrative complaint with the Department of Homeland Security's ("DHS")

Office of Civil Rights and Civil Liberties ("CRCL").  CRCL is charged with

promoting civil rights and civil liberties by, among other things, investigating

---

[3] Video of Baker County Correctional Management Corporation Meeting, 30:06-40:00, https://www.facebook.com/watch/live/?ref=watch_permalink&v=751598395951886.

civil rights complaints arising from DHS activities (including immigration detention).[4]

54.    The July 2022 complaint described the "range of abuses" experienced by individuals detained at Baker, including "excessive use of force and physical assaults, extreme medical neglect, racist harassment and targeting, retaliation, impediments to accessing legal counsel, and lack of adequate hygiene, food, or COVID-19 safety measures."[5]

55.    The complaint urged CRCL and the DHS Office of the Inspector General to recommend the permanent termination of the IGSA between ICE and BCSO.[6]

56.    The complaint drew extensive media coverage.  One headline quoted the complaint's assessment of Baker as "'a living hell' for immigrants," and noted the allegations that "conditions at the Baker detention center place

---

[4] Dep't of Homeland Security, *Office for Civil Rights and Civil Liberties*, https://www.dhs.gov/office-civil-rights-and-civil-liberties.

[5] Immigrant Action Alliance et al., Multi-Individual Complaint re: Baker County Detention Center for Inhumane Conditions – Physical Assault, Medical Neglect, Verbal Abuse, Racialized Harassment and Targeting, COVID-19 Negligence, and Retaliation (July 21, 2022) (hereinafter "IAA et al. Complaint"), *available at* https://tinyurl.com/5xth2x6u.

[6] *Id.*

people's lives in danger."[7]  Another news report highlighted the growing fears of

retaliation among individuals who were named or otherwise participated in the

complaint.[8]  The media coverage also referenced the July 26, 2022 ACLU of

Florida letter to ICE, and the ACLU of Florida's Deputy Legal Director was

included in media interviews contrasting the allegations with Defendant

Rhoden's denial of the same.

57.    Sheriff Rhoden became personally involved in the response to the

CRCL complaint and the ACLU of Florida's allegations of inhumane conditions.

He granted a local news organization "unprecedented access" to Baker's

immigration detention wing and gave an interview seeking to defend the facility

against the allegations.  In the interview, which aired in early August, Sheriff

Rhoden expressed an unwillingness to open the facility to individuals seeking to

shed light on potential abuse, stating: *What I'm not going to do is allow people to*

*come in here and lie about our facility*, the job that our people do here—because we

---

[7] Florida Times-Union, *Federal complaint claims 'a living hell' for immigrants inside ICE's Baker County Detention Center*, First Coast News, July 26, 2022, https://www.firstcoastnews.com/article/news/politics/federal-complaint-ice-baker-county-detention-center-abuse-racial-profiling/77-a5b56ed1-16c1-49e6-8c11-a12e3988c298.

[8] Tarik Minor, *Civil rights groups file complaint alleging 'inhumane conditions' at federal wing of Baker County jail*, News4Jax, July 27, 2022, https://www.news4jax.com/i-team/2022/07/26/civil-rights-groups-file-complaint-alleging-inhumane-conditions-at-federal-wing-of-baker-county-jail/.

take pride in our job.  I'm not going to stand by and remain silent and not vigorously defend what we do here at the Sheriff's Office because our people do a great job here on a day-to-day basis, and I'm going to stand behind that what we do here is right."[9]

58.     The news team interviewed the ACLU of Florida's Deputy Legal Director as well, who reiterated that detained individuals are in fact experiencing the abuses alleged in the federal complaint.  The article further notes that the ACLU of Florida was not only advocating for unannounced inspections, but also considering "legal action against the facility."

59.     As noted, Defendant Crews and others directly criticized the ACLU of Florida's work at a public meeting of the BCCMC board of directors on August 18, 2022.  Defendant Crews repeatedly characterized the ACLU of Florida as lying about the facility.  He concluded his remarks by criticizing the ACLU of Florida for creating a "public spectacle" by "sen[ding] their complaints out publicly."  He further stated that the organization was "using the public domain to try to push a certain agenda."

---

[9] Tarik Minor, *I-TEAM given exclusive access by Baker County sheriff to federal wing of jail where immigrant detainees allege 'inhumane conditions'*, News4Jax, Aug. 3, 2022, https://www.news4jax.com/i-team/2022/08/03/i-team-given-exclusive-access-by-baker-county-sheriff-to-federal-wing-of-jail-where-immigrant-detainees-allege-inhumane-conditions/.

### D.    The ACLU of Florida's Creation and Announcement of the Baker Legal Assistance Program

60.    At the same time it was engaging in the advocacy efforts described above, the ACLU of Florida was collaborating with three law school clinics and several pro bono attorneys (together, "Program Participants") to develop the Baker Legal Assistance Program.  The participating clinics are the Florida State University Farmworker and Immigration Rights Clinic, the University of Florida Immigration Clinic, and the University of Miami Immigration Clinic (together, the "Clinics").

61.    The Baker Legal Assistance Program seeks to "shed light and address the mistreatment of immigrants at the detention center while providing access to counsel for their immigration cases."[10]

62.    The overwhelming majority—86 percent—of detained immigrants in removal proceedings nationwide are not represented by counsel.[11]  The number of unrepresented individuals at Baker is consistent with the situation nationwide, predictably in light of the facility's remote location.  The Baker Legal Assistance

---

[10] ACLU of Florida, *Florida University Law Clinics and the ACLU of Florida Launch New Immigration Legal Representation Program at ICE Detention Center*, Sept. 7, 2022, https://tinyurl.com/3m8kjknj.

[11] Ingrid V. Eagly & Steven Shafer, *A National Study of Access to Counsel in Immigration Court*, 164 U. Pa. L. Rev. 1, 30 (2015).

Program seeks to address these issues by expanding access to pro bono representation.

63.    The plan for the Baker Legal Assistance Program involved each of the Clinics visiting Baker at least once per semester to conduct Know Your Rights presentations, screening interviews with prospective clients, and meetings with existing clients.  Each clinic planned to take on multiple cases per semester, including requests for bond and parole.  Pro bono counsel would assist with cases that the Clinics did not have the capacity or resources to handle.

64.    The ACLU of Florida plays a coordinating role in the Baker Legal Assistance Program.  In particular, the ACLU of Florida assists with placing the cases that the Clinics are unable to take with pro bono counsel, focusing in particular on cases seeking the release of detained individuals.

65.    In August 2022, the ACLU of Florida and the Clinics sent ICE a formal, written request to conduct Know Your Rights presentations and in-person legal interviews at Baker on three separate dates: September 9, September 30, and October 14.

66.    The request made clear that the visits would involve "one-on-one conversations between attorneys, legal representatives, and potential clients."

Because such conversations would be "privileged," the letter asked that space be made available in the law library and pods where private conversations could take place outside the earshot of BCSO and ICE officers. The law library and housing units are historically where BCSO has scheduled such visits.

67.    On August 24, 2022, the Assistant Field Office Director of ICE's Miami Field Office informed the Clinics that the request had been approved.

68.    On August 25, 2022, Baker's Chaplain and Programs Coordinator, Tommy Richardson, sent an email confirming that the ACLU of Florida and FSU Clinic could visit Baker on September 9, 2022 as planned.

## III.    DEFENDANTS DENY THE ACLU OF FLORIDA THE ABILITY TO MEET WITH CLIENTS AND PROSPECTIVE CLIENTS AT BAKER

### A.    Defendants' Abrupt, Unexplained Cancellation of Legal Visits on September 9, 2022

69.    Consistent with their previously approved request, the ACLU of Florida and the FSU Clinic made plans to visit Baker on September 9, 2022.

70.    Coordinating the visit required the expenditure of significant time and resources, as all participating attorneys and students had to travel a significant distance and schedule the visit around their obligations as counsel to other pro bono clients.

25

71.    The attorneys and students participating in the visit planned to discuss prospective clients' immigration cases and document complaints regarding the poor conditions at Baker.

72.    At ICE's request, the ACLU of Florida and FSU Clinic submitted additional details about their visit for use in an official flyer to be displayed at Baker.  The flyer makes clear that the purpose of the visit is to "[p]resent on legal rights and conduct legal screenings" and that the visit would take place in the law library and pods.

73.    On the morning of September 7, 2022—two days before the scheduled visit—Defendant Evelyn Blue sent an email "postpon[ing]" the "presentation" until further notice.  Ex. 1 at 2.  She further stated that the Program's visit scheduled for September 30 would be "reevaluated closer to that date."  *Id.*

74.    Defendant Blue provided no explanation in her email for the abrupt cancellation of the presentation.  Nor did she provide any alternative dates for rescheduling.

75.    ACLU of Florida Deputy Legal Director Katherine H. Blankenship responded to Captain Blue asking for an explanation for the cancellation,

requesting dates to reschedule the presentation, and clarifying that the ACLU of Florida and FSU Clinic would still travel to Baker to conduct legal screenings and visits. Captain Blue stated in response that "the visit that was scheduled for this Friday is postponed. Should you still wish to speak with the detainees that you referenced, you are able to schedule phone calls with Mr. Richardson. At this time you will not have access to the facility on Friday." *Id*. at 1.

76.    Ms. Blankenship then spoke by phone with Mr. Richardson, who had spoken with Defendant Blue. He indicated that the decision was final and that the attorneys and students would not be allowed in the building. He also stated that the decision to deny the group access had been made by someone "higher up" in the chain of command than Defendant Blue and that it was out of Defendant Blue's hands.

77.    Upon information and belief, Defendant Rhoden is Defendant Blue's supervisor, and, in light of Mr. Richardson's statement immediately above, he likely gave Defendant Blue the instruction not to allow the ACLU of Florida into the facility. That instruction is consistent with Defendant Rhoden's public threat that he would not "allow people to come in here and lie about our facility[.]"[12]

---

[12] *See* Tarik Minor, News4Jax, Aug. 3, 2022, *supra*.

78.    Ms. Blankenship subsequently spoke to officials from ICE/ERO. Those officials suggested that legal visits on Friday would still be possible after all and    advised Ms. Blankenship to submit a list of the individuals with whom the group wished to meet.

79.    Ms. Blankenship accordingly sent BCSO employees a list of individuals who had previously contacted the ACLU of Florida requesting to meet with attorneys on September 9, 2022, including Mr. Mejia Encarnacion.  Ex. 2.

80.    At that point, the communications from BCSO grew openly hostile.

81.    Defendant Randy Crews, the Baker County Undersheriff, stated in an email: "This will be the last [email] from this agency, simply stated there will be no visits tomorrow.  Your continuous badgering will not change that."  *Id.*

82.    Ms. Blankenship subsequently sent another email requesting the right to conduct "attorney visits" with the individuals on the list on September 9, 2022.  Ex. 3.  Defendant Crews responded by email, refusing to schedule the requested legal visits because they were "not [the] original purpose for tomorrow's visit."  *Id.*

83.     That statement is demonstrably false.  The initial request for
approval made clear that confidential legal visits would in fact take place and
were always part of the planned events for all visits by the Baker Legal
Assistance Program.  The individuals included in the list provided by Ms.
Blankenship were individuals who would have been seen as part of the Know
Your Rights presentation and follow-up legal screenings and visits.  Ms.
Blankenship only provided the list of individuals per ICE/ERO's instructions to
ensure that legal visits would be allowed to proceed.

84.     On the morning of September 9, 2022, the participating attorneys
and law students arrived at the facility in person to conduct legal visits and were
denied access by BCSO employees.  At that time, a BCSO supervisor informed
the group that the reason they could not hold in-person legal visits was because
the facility did not have the space required to conduct legal visits.

85.     This, too, was demonstrably false.  There are three attorney-client
meeting rooms that are clearly visible upon entering the lobby at Baker.  At the
time of that conversation on September 9, 2022, all three attorney-client rooms
were visibly unoccupied.  The ACLU of Florida and FSU Clinic attorneys and
law students remained at Baker for the better part of an hour, and the three

attorney-client rooms remained empty the entire time.  There were also no other attorneys present at the facility to meet with clients or prospective clients.

86.    BCSO officials nonetheless refused to reconsider the decision, even after the attorneys present explained that the denial of access violated the Constitution and the applicable ICE detention standards.

87.    On the afternoon of September 9, 2022, the ACLU of Florida sent a demand letter addressed to Defendant Rhoden.  The letter explained that the denial of access violated Defendants' obligations under the 2019 NDS and the First and Fourteenth Amendments to the U.S. Constitution.

88.    Defendant Rhoden never responded to the demand letter or even acknowledged receipt.

89.    Defendant Rhoden further failed to take any steps to ensure access to legal visits and declined to provide any explanation as to why his office had refused the ACLU of Florida and FSU Clinic access to existing and prospective clients.

**B.    Defendants' Refusal to Reschedule Canceled or Postponed Visits**

90.    The Baker Legal Assistance Program had also previously obtained approval for another participating clinic—the University of Miami Immigration

Clinic—to visit Baker on September 30, 2022. The Program sent a letter to ICE and BCSO explaining that attorneys from the ACLU of Florida would be joining the visit since they had been denied access to clients and prospective clients on September 9, 2022. BCSO initially confirmed the visit, but it was ultimately postponed due to Hurricane Ian.

91.    The Program promptly sought to reschedule both of the visits that had been canceled or postponed. On October 3, 2022, the Program informed BCSO that the UM Clinic could visit Baker on Friday, October 28 and the FSU Clinic could visit on Friday, November 11. The ACLU of Florida intended to attend those events as well.

92.    BCSO rejected the proposed dates for the rescheduled visits without explanation. In an email from Mr. Richardson, BCSO maintained that the 2019 NDS "do[] not require an explanation as to why a date may not be agreeable to one party or the other." BCSO declared that the rescheduled visits would instead take place in December and January, offering the following dates: December 2, 9, and 16 and January 13, 20, and 27, all of which are approximately three months from the originally scheduled visits.

93.     As the Program Participants have explained to BCSO, the Baker

Legal Assistance Program cannot visit Baker on any of those dates.  Law schools

and affiliated clinics operate on a semester basis, with the fall semester ending in

early December.  At the University of Miami, for example, BCSO's proposed

December dates all fall within either the exam period or the dedicated time to

prepare for exams and are therefore unworkable.  Moreover, because January

marks the start of a new semester, most of the students currently enrolled in the

clinics—the students who prepared for the Baker visits—will no longer be

participating by BCSO's proposed January dates.

94.     BCSO's denial of access on September 9 and its refusal to timely

reschedule the September 9 and 30 visits has harmed detained individuals who

wish to participate in the Program.

95.     Baker does not have a legal service provider that participates in the

Department of Justice's Legal Orientation Program.  Accordingly, there is no

organization that regularly holds Know Your Rights presentations or sessions or

workshops at which individual cases can be discussed.

96.     The Baker Legal Assistance Program seeks to serve a similar role for

the individuals detained at Baker, many of whom have time-sensitive

immigration issues and complaints of mistreatment.  By refusing and delaying the Program's access to Baker, BCSO has inhibited the ACLU of Florida and the Clinics from assisting clients and prospective clients in obtaining representation and addressing these time-sensitive matters.

## IV.   ADDITIONAL RESTRICTIONS ON ACCESS TO COUNSEL AT BAKER

97.    The restrictions Defendants have imposed on the Baker Legal Assistance Program reflect a broader pattern of limited access to counsel at the facility.  Defendants' policies and practices routinely deny detained immigrants access to counsel by preventing them from engaging in the uninhibited attorney-client communications that the Constitution protects.

### A.   Defendants Do Not Provide Access to Confidential Legal Phone Calls

98.    Defendants significantly interfere with the attorney-client relationship by refusing to ensure that detained individuals can have private, confidential phone calls or remote visits with attorneys.

99.    Baker is located in Macclenny, Florida, a small, rural community about an hour from Gainesville and nearly an hour from Jacksonville.  It has limited access to immigration attorneys and pro bono services.  There are zero

immigration attorneys listed in Macclenny in the Florida Bar Directory, and an internet search reveals zero pro bono or legal aid organizations available to provide immigration assistance in Macclenny.

100.    Free, confidential legal calls and remote visits are therefore imperative for attorneys representing clients at Baker.  Any reliance on in-person visits as a substitute for confidential legal calls and remote visits is impractical given the lack of local legal service providers, as well as ongoing uncertainty about whether Defendants will permit in-person visits to proceed.

101.    Defendants, however, do not permit free, confidential legal calls or remote visits to take place.

### 1. Defendants Are Currently Refusing to Schedule Any Legal Calls

102.    On or around November 30, 2022, Defendants adopted a new policy prohibiting the scheduling of any confidential legal phone calls with individuals detained at Baker.

103.    On December 2, 2022, ACLU of Florida attorneys sought to schedule a legal call with Mr. Mejia Encarnacion, following the typical practice of emailing the BCSO employees responsible for setting up legal calls.  Mr. Richardson responded stating: "At this time we are no longer scheduling legal calls for

inmates/detainees until further notice.  Your avenues for the time being will be

through Secures [sic] Technologies for e-messaging or attorney video visits with

unmonitored lines of which you must register through their website for these

services.  We do offer at facility visits with your clients by scheduling with

Lorretta Rowe at 904-259-3311.  We also can deliver a message to your client to

have them call you if you prefer."

104.    The ACLU of Florida learned from other immigrants' rights

organizations that BCSO also refused to schedule their legal calls.  A BCSO

employee informed one organization that BCSO had suspended legal calls

because of this lawsuit brought by the ACLU of Florida.

105.    The video teleconferencing ("VTC") visits referenced by Mr.

Richardson are an insufficient alternative to confidential legal calls.

106.    BCSO has only recently made such visits available through Securus,

a private telecommunications company.  A 20-minute meeting on Securus costs

$7.99 and a 40-minute meeting costs $12.99.

107.    VTC visits are not a feasible option for the overwhelming majority of

detained individuals and their attorneys due to their prohibitive cost.

108. Defendants do not waive the VTC costs even for attorneys providing pro bono representation to detained individuals, including indigent clients.

109. The callback option referenced by Mr. Richardson is also an inadequate alternative to a scheduled legal call.

110. Any call placed by a detained individual to an attorney is not confidential, as the call takes place from the housing unit where BCSO employees and other detained individuals are present. The phones in the housing units are not located in a private space that guarantees confidentiality. Accordingly, all calls placed from the unit take place within earshot of BCSO employees and other detained individuals.

111. In addition, unless the attorney has successfully navigated the process of registering a phone number as an attorney line, the call placed from the unit is subject to recording and monitoring.

112. According to Baker's detainee handbook, if a detained individual calls an attorney from the housing unit, the call is limited to 20 minutes. This time limit makes it extremely difficult for attorneys and clients to have sufficient time to discuss the details of a case, secure the necessary background

information, explain a client or prospective client's options, and establish basic rapport and trust in the attorney-client relationship.

113.    There are other problems with the callback option, including the significant delay that often results if either the detained individual does not receive the message to call the attorney in a timely manner or the attorney is unavailable at the time a detained individual calls back.

114.    If attorneys are forced to message their client via Securus to request a call at a specific time, that message costs money and may not be received promptly.  In addition, all e-messages on Securus, even messages exchanged with registered attorney accounts, are monitored.

115.    Finally, in-person visits are not a viable alternative for most attorneys with clients detained at Baker.  As noted, there are few attorneys located near Baker who can provide immigration or pro bono assistance.  The ACLU of Florida does not have staff members located nearby who could readily visit Baker for in-person legal visits.  The cancellation of the ACLU of Florida's visit on September 9 also creates considerable uncertainty about whether any planned visits would be allowed to proceed.

116.    This new policy harms detained individuals, including Mr. Mejia Encarnacion, whose current counsel in his habeas proceedings and in this case are not located near Baker.  Mr. Mejia Encarnacion's counsel have not been able to schedule free, confidential legal calls with him since the new policy was instituted.  Mr. Mejia Encarnacion is indigent and unable to afford the high costs of the Securus platform.

### 2. Defendants' Prior Policy Also Precluded Confidential Legal Calls

117.    Until approximately November 30, 2022, Defendants allowed attorneys to schedule legal calls in advance.  Those calls, however, were not confidential either.

118.    Defendants previously required all such attorney calls to take place in the "law library," a multipurpose room near the housing units.

119.    BCSO employees explained during the ACLU of Florida's tour of the facility that BCSO requires an officer to be stationed in the law library at all times, allegedly to monitor usage of the law library computer.

120.    The law library contains a single phone for legal calls.  The phone is located only a few feet from the computer that BCSO officers are assigned to monitor.

121.    Upon information and belief, the phone in the law library is the sole phone that BCSO has historically made available for "confidential" legal calls, even though the facility can house hundreds of individuals in immigration custody.

122.    The calls from the law library phone were never confidential in practice.  The phone in the law library is surrounded by a plastic partition, but the partition is approximately five to six feet tall and does not come close to reaching the ceiling.  It therefore does not prevent others from easily overhearing legal calls.

123.    Officers stationed in the law library and other detained individuals who are present can overhear detained individuals' side of conversations with attorneys.

124.    Mr. Mejia Encarnacion has had to speak with his attorneys from the telephone in the law library on many occasions.  Accordingly, he has been forced to discuss both his habeas proceedings challenging his detention and his reports of abusive conditions of confinement, including retaliation for speaking out about those conditions, in front of BCSO employees and other detained individuals.

125.   There were numerous other issues with legal calls at Baker even under the prior policy.  Defendants often failed to initiate calls as scheduled, cut scheduled calls short, and failed to ensure adequate connectivity.  Calls were therefore frequently missed altogether or disconnected in the middle of a conversation, requiring attorneys to contact the facility again and attempt to be reconnected or wait several days for the opportunity to reschedule the call.

126.   The only other option for legal phone calls under the prior policy was for detained individuals to pay to call attorneys from the housing units.  As noted, however, the phones in the housing units are located in the common area, and BCSO staff and other detained individuals can overhear all conversations that take place on those phones.

127.   As noted, VTC visits are not a feasible alternative to confidential legal calls.  Although BCSO has indicated that detained individuals are located in a private space during VTC visits, it is not clear whether that is the case.  In addition, the high cost per visit (and Defendants' failure to waive the cost for pro bono counsel and indigent clients) makes VTC an unrealistic option.

128.    Defendants have no justification for failing to make a private, confidential space available for detained individuals' legal phone calls, particularly since Defendants claim to provide such a space for VTC visits.

129.    Defendants' claimed ability to provide private spaces for costly VTC visits confirms that Defendants have the capacity and resources to provide similar spaces to ensure free, confidential, and private communications between detained individuals and counsel, but have declined to do so.

### B.    Defendants Interfere with the Delivery and Confidentiality of Legal Mail

130.    Defendants have also adopted and implemented two policies and practices relating to legal mail, each of which further undermines the ability of detained individuals to communicate confidentially with counsel.

### 1.    Defendants' Email Verification Policy

131.    First, BCSO's written policy governing legal mail unnecessarily requires attorneys to notify BCSO about incoming legal mail before the mail arrives at Baker.  It states: "Private attorney's [sic] wishing to mail an inmate/detainee privileged mail must provide a prenotification email to the facility at legalmail@bakerso.com prior to the arrival of the correspondence. Failure to provide this notification may result in the correspondence being

denied or delivery delayed until authentication from the sender can be determined by the Mail Clerk."

132.    Mr. Mejia Encarnacion has had legal mail rejected  because of the verification policy.

133.    For example, on October 5, 2022, Mr. Mejia Encarnacion's attorney sent him documents relating to his pending habeas proceeding.

134.    On October 13, 2022, Mr. Mejia Encarnacion received a "Mail Denial Form" notifying him that the mail would be returned to sender.  The form clearly notes that the mail had been sent by the Seton Hall Law School's Center for Social Justice, where Mr. Mejia Encarnacion's attorney of record is employed.  As the explanation for rejecting the mail, the form states that it "contains legal papers without a verification email to BCSO."

135.    Defendants have not posted the legal mail policy online or elsewhere and make no effort to provide advance notice of the policy to attorneys.

136.    Many attorneys with current clients at Baker, particularly immigration attorneys, are located out of state and do not have prior experience with the facility.  Accordingly, many attorneys do not learn about the verification

policy, even after their legal mail is returned. This results in extended delays in detained individuals' receipt of legal mail, much of which is time-sensitive and can have serious negative implications for the ability of a detained individual to secure release or advocate for their rights.

137. The ACLU of Florida has also experienced delays in the delivery of its legal mail to detained individuals at Baker and has had multiple pieces of legal mail returned without delivery or explanation because of the verification policy.

138. ACLU of Florida attorneys regularly sent legal mail to individuals at Baker in June and July 2022 without sending verification emails, and Defendants had not rejected any such correspondence. Around August or September 2022, however, Defendants began refusing to deliver mail and instead either held it indefinitely or returned it to the ACLU of Florida with no explanation. Only on September 20, 2022, did a BCSO employee notify Ms. Blankenship by voicemail that a verification email was required.

139. Thus, Defendants began applying the policy to the ACLU of Florida without providing any notice to its attorneys that a verification email was required.

140.    Defendants continued to revise the policy even after providing a copy to the ACLU of Florida.  Lieutenant Brad Harvey provided a written copy of the policy during the ACLU of Florida's visit to Baker on October 14 but emailed a revised Microsoft Word version of the policy later that day, noting that he had "added in the email address in which the prenotification must be sent to." Although the policy purports to list all of the dates it was revised, it notably does not include the October 14 date on which Lieutenant Harvey admitted he revised the policy.

141.    Upon information and belief, Defendants selectively apply the verification policy to certain correspondence—in particular, the correspondence of individuals who have sought to vindicate their constitutional rights by speaking with attorneys about the egregious conditions at Baker.

142.    These individuals include Mr. Mejia Encarnacion, who has submitted administrative petitions, participated in the ACLU of Florida's complaint to CRCL,[13] and filed a habeas petition in federal court challenging his detention as unlawful.  They also include other clients and prospective clients of

---

[13] ACLU of Florida, Multi-Individual Complaint Regarding Inhumane Conditions and Unlawful Treatment at Baker County Detention Center, Including Retaliation, Physical Assault, Medical Neglect, and Unsanitary Conditions, Sept. 13, 2022, https://www.aclufl.org/en/crcl-complaint-baker-county-detention-center.

the ACLU of Florida, many of whom have spoken out publicly about the abuses they have experienced.

### 2.  Defendants' Practice of Improperly Opening Legal Mail

143.    Second, Defendants have implemented a practice of improperly opening and inspecting legal mail prior to delivering it to detained individuals, contrary to BCSO's formal written policy.

144.    Mr. Mejia Encarnacion has received opened legal mail from his attorney on approximately six occasions.

145.    The mail was clearly marked with the legal organization of Mr. Mejia Encarnacion's attorney of record, Stephanie Ellie Norton of Seton Hall Law School's Center for Social Justice.  Yet officers opened the mail outside of Mr. Mejia Encarnacion's presence and brought him the opened mail along with a copy of the envelope.

146.    Defendants' practice of improperly opening legal mail impedes the attorney-client relationship, as detained individuals and their attorneys can no longer trust that their written communications will remain confidential.

147.    Upon information and belief, Defendants selectively open the correspondence of certain individuals—in particular, those who have sought to

vindicate their constitutional rights by speaking with attorneys about the

egregious conditions at Baker.

## V.    DEFENDANTS' ACTIONS, POLICIES, AND PRACTICES HARM THE ACLU OF FLORIDA AND DETAINED INDIVIDUALS

148.    Defendants' actions, policies, and practices make it substantially

more difficult for detained individuals to obtain representation and to freely

communicate with counsel once retained.

149.    The denial of access to the Baker Legal Assistance Program,

including the ACLU of Florida, on September 9, 2022, and the refusal to timely

reschedule the Program's visits means detained individuals at Baker are less

likely to obtain representation.  The in-person screening of individual cases is a

critical step in the process of obtaining representation from either the Clinics or

pro bono partners.

150.    Many individuals have bond hearings scheduled in the near future,

and they are considerably more likely to be released if they are represented by

counsel at those hearings.  Indeed, detained immigrants represented by lawyers

are almost seven times more likely than those who appear pro se to be released.[14]

---

[14] Eagly & Shafer, *supra* note 11, at 9, 70 (describing outcomes in removal proceedings between 2007 and 2012); *see also* Emily Ryo, *Detained: A Study of Immigration Bond Hearings*, 50 Law &

151.    Multiple individuals who could have obtained representation from the Program after September 9 or a timely rescheduled visit have instead had to appear at their scheduled hearings pro se.

152.    Confidential, in-person visits—like the ones Defendants canceled and refused to timely reschedule—are also essential when attorneys have time-sensitive documents that clients and prospective clients need to review or sign with counsel.  These include privacy waivers, representation forms formalizing an attorney-client relationship, detailed factual records kept by individuals, and declarations from individuals about their mistreatment.

153.    Absent the ability to review these documents in person with clients and prospective clients, attorneys are forced to rely on the mail and run the risk that important, sensitive documents will either be returned undelivered or intercepted and read.  The resulting delays and potential retaliation against detained individuals can have serious consequences for individuals' cases and their physical and mental well-being.

154.    Defendants' actions, policies, and practices also make it less likely that detained individuals experiencing abusive conditions at Baker can speak

---

Soc'y Rev. 117, 119 (2016) (explaining that detained immigrants' likelihood of securing bond is substantially higher when represented by counsel).

confidentially with civil rights lawyers at the ACLU of Florida and obtain

assistance in submitting CRCL complaints, filing lawsuits, or taking other steps

to vindicate their rights.  Clients and prospective clients are less likely to reach

out to the ACLU of Florida regarding highly sensitive matters—including

retaliation, harassment, and physical assaults by officers— when they are not

able to meet with attorneys in person or speak with them from a private,

confidential space.

155.   Defendants' failure to guarantee confidential attorney-client

communications impairs counsel's ability to effectively represent their clients.

For example, in civil rights matters alleging mistreatment at Baker, detained

individuals must communicate with their attorneys about the words and actions

of BCSO officials—the very same officials who can overhear their conversations

and intercept their mail.  Detained individuals who reasonably fear they will be

subjected to retaliation are likely to, and very often do, hesitate before speaking

candidly with their attorneys under those circumstances.  Similarly, many

detained individuals' immigration cases involve highly sensitive information—

including, for example, requests for asylum based on a fear of persecution, which

require individuals to share potentially life-threatening details with their

counsel.

156.    In addition to causing harm to detained individuals, Defendants'

actions, policies, and practices relating to access to counsel directly harm the

ACLU of Florida as an organization.  A primary objective of the ACLU of Florida

is to protect the individuals detained at Baker by advocating for ICE to terminate

its contract with BCSO or, at minimum, for dramatic improvements in the

conditions of confinement.  The ACLU of Florida cannot accomplish that

objective without meeting with and communicating confidentially with detained

individuals who wish to share their experiences.

157.    As explained, many individuals at Baker are fearful of speaking out

due to Defendants' pattern and practice of retaliation.  Those individuals are

even less likely to share their stories when the very people who mistreat them

can hear or read everything they say.  Defendants' actions on September 9 and

their ongoing policies restricting access to counsel risk chilling the ACLU of

Florida's efforts to hold them accountable for the egregious abuses that continue

unabated.

## CLAIMS FOR RELIEF

### COUNT I

### Violation of Plaintiff ACLU of Florida's First Amendment Right to Free Speech
### (Denial of Access)
### (Against All Defendants)

158.    Plaintiffs incorporate by reference paragraphs 1 through 157 as if set forth in full herein.

159.    The First Amendment, as applied to state and local government agencies and officials by the Fourteenth Amendment, prohibits governmental entities from "abridging the freedom of speech."  U.S. Const. Amend. I.

160.    Plaintiff ACLU of Florida has a right to free speech under the First Amendment, which includes the right to speak to clients, prospective clients, and witnesses about their legal rights and about potential civil rights claims.  *See, e.g.,* *In re Primus*, 436 U.S. 412, 423-26, 431 (1978); *NAACP v. Button*, 371 U.S. 415, 428-30 (1963).

161.    The ACLU of Florida's First Amendment right to free speech extends to communications with prospective clients who are in detention.  *See* *Thornburgh v. Abbott*, 490 U.S. 401, 407-08 (1989) (those who wish to communicate with prisoners "have a legitimate First Amendment interest in access to

prisoners"); *Procunier v. Martinez*, 416 U.S. 396, 408-09 (1974) (both incarcerated individuals and those with whom they correspond have First Amendment rights that can be infringed by unjustified government interference), *overruled in part on other grounds by Thornburgh*, 490 U.S. 401.

162.    On September 9, Defendants denied the ACLU of Florida and affiliated individuals access to clients, prospective clients, and witnesses who could shed light on potential constitutional violations at Baker.  Defendants also refused to timely reschedule canceled visits during which the Baker Legal Assistance Program, including the ACLU of Florida, would be able to meet with groups of individuals outside the earshot of officers.

163.    By doing so, Defendants interfered with the organization's ability to carry out a core component of its public interest mission—namely, to protect and defend the rights of detained individuals.

164.    Defendants have provided no justification for the denial of access to the facility.

165.    Upon information and belief, Defendants denied access to the ACLU of Florida based on the content or viewpoints it presumes will be expressed during and following its conversations with detained individuals.  Accordingly,

Defendants' conduct also amounts to unconstitutional content and viewpoint discrimination in violation of the First Amendment.  *See Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 829 (1995).

166.    Defendants Rhoden, Crews, and Blue all personally and substantially participated in the decision to cancel the ACLU of Florida's pre-approved visit to Baker and deny access to the facility, which was contrary to clearly established law.  Upon information and belief, Defendant Rhoden made the decision to cancel the visit and ordered Defendants Crews and Blue to implement the decision.  Upon information and belief, Defendant BCCMC has failed to exercise any oversight to prevent violations of the Constitution and the NDS and has failed to take any steps to hold Defendants responsible for such violations.

## COUNT II

**Violation of Plaintiff ACLU of Florida's First Amendment Right to Freedom from Retaliation for Engaging in Constitutionally Protected Activity**
**(Denial of Access)**
**(Against All Defendants)**

167.    Plaintiffs incorporate by reference paragraphs 1 through 157 as if set forth in full herein.

168.    The First Amendment prohibits the government from retaliating against individuals and organizations based on their protected activity.  A First Amendment retaliation claim requires a plaintiff to show "first, that his speech or act was constitutionally protected; second, that the defendant's retaliatory conduct adversely affected the protected speech; and third, that there is a causal connection between the retaliatory actions and the adverse effect on speech." *Bennett v. Hendrix*, 423 F.3d 1247, 1250 (11th Cir. 2005).

169.    Plaintiff ACLU of Florida has engaged in constitutionally protected activity by, among other things, publicly advocating for the improvement of conditions at Baker and the termination of the agreement between ICE and BCSO.  The ACLU of Florida has also engaged in protected activity by meeting with clients and prospective clients detained at Baker who have suffered from mistreatment and abusive conditions of confinement.  The ACLU of Florida advises these individuals about their rights and provides information about potential avenues for seeking redress for constitutional violations.  *See NAACP*, 371 U.S. at 434.

170.    Defendants have taken adverse action against the ACLU of Florida by abruptly canceling pre-scheduled, pre-approved legal visits at Baker with no

explanation and refusing to timely reschedule additional visits.  Under the

objective standard, a defendant takes "adverse action" when its "conduct would

likely deter a person of ordinary firmness from the exercise of First Amendment

rights." *Bennett*, 423 F.3d at 1250 (internal quotation marks omitted).

171.    Defendants' actions depriving the ACLU of Florida of access to

clients, prospective clients, and sources of information significantly interfere with

the organization's ability to carry out its mission and would deter a person of

ordinary firmness from continuing to engage in protected activity.

172.    There is a causal connection between the ACLU of Florida's

protected activity and Defendants' adverse actions.  Defendants specifically

targeted visits planned by the Baker Legal Assistance Program—a program

created and coordinated by the ACLU of Florida not only to improve access to

counsel for detained immigrants, but also to hold Baker accountable for abusive

conditions.

173.    Defendants had knowledge of the ACLU of Florida's

constitutionally protected activity, including its intent to inform detained

immigrants of their legal rights, its ongoing efforts to gather information about

potential constitutional violations, and its public advocacy for improved

conditions at the facility. *See Farrow v. West*, 320 F.3d 1235, 1248 (11th Cir. 2003).

174.    Defendants canceled these visits within days of the ACLU of

Florida's constitutionally protected activity, which strongly supports an

inference of causation. *See Brungart v. BellSouth Telecommc'ns, Inc.*, 231 F.3d 791,

799 (11th Cir. 2000).

175.    Defendants have provided no justification for the denial of access to

the facility.

176.    Finally, Defendants appear to have exclusively denied access to the

ACLU of Florida and others known by BCSO to be affiliated with the ACLU of

Florida.  BCSO employees' own statements indicate that the facility was open to

other attorneys on September 9, 2022.

177.    Defendants Rhoden, Crews, and Blue all personally and

substantially participated in the decision to cancel the ACLU of Florida's pre-

approved visit to Baker and deny access to the facility, which was contrary to

clearly established law.  Upon information and belief, Defendant Rhoden made

the decision to cancel the visit and ordered Defendants Crews and Blue to

implement that decision.  Upon information and belief, Defendant BCCMC has

failed to exercise any oversight to prevent violations of the Constitution and the NDS and has failed to take any steps to hold Defendants responsible for such violations.

## COUNT III

**Violation of First Amendment Right to Free Speech of Detained Clients and Prospective Clients, Including Plaintiff Mejia Encarnacion**
**(Denial of Access)**
**(Against All Defendants)**

178.    Plaintiffs incorporate by reference paragraphs 1 through 157 as if set forth in full herein.

179.    "[T]he First Amendment protects the right of an individual or group to consult with an attorney on any legal matter." *Denius v. Dunlap*, 209 F.3d 944, 954 (7th Cir. 2000); *see also DeLoach v. Bevers*, 922 F.2d 618, 620 (10th Cir. 1990) ("The right to retain and consult with an attorney . . . implicates not only the Sixth Amendment but also clearly established First Amendment rights of association and free speech.").

180.    The individuals detained at Baker have a First Amendment right to speak with attorneys about prospective legal claims. *See, e.g., Procunier*, 416 U.S. at 408-09 (recognizing the First Amendment rights of incarcerated individuals to communicate with people outside of prison walls); *cf. Mitchell v. Peoples*, 10 F.4th

56

1226, 1229-31 (11th Cir. 2021) (a facility violates a detained person's right to free speech by engaging in conduct that undermines the confidentiality of attorney-client communications).  These include Mr. Mejia Encarnacion, who appeared on the list of individuals with whom the ACLU of Florida intended to have legal visits on September 9, 2022.

181.   Defendants denied detained individuals, including Mr. Mejia Encarnacion, the ability to meet with attorneys who could potentially represent them in legal proceedings and assist them in asserting their constitutional rights. Many of these individuals have upcoming bond hearings or need urgent attention to medical issues or other conditions of confinement.

182.   Defendants have provided no justification for denying individuals the ability to meet confidentially with counsel.

183.   Upon information and belief, Defendants denied these individuals the ability to speak with the ACLU of Florida and other attorneys based on the content or viewpoints Defendants presume will be expressed during and following such conversations.  Accordingly, Defendants' conduct also amounts to unconstitutional content and viewpoint discrimination in violation of the First Amendment.  *See Rosenberger*, 515 U.S. at 819.

184.    Defendants Rhoden, Crews, and Blue all personally and substantially participated in the decision to cancel the ACLU of Florida's pre-approved visit to Baker and deny access to the facility on September 9, 2022, which was contrary to clearly established law.  Upon information and belief, Defendant Rhoden made the decision to cancel the visit and ordered Defendants Crews and Blue to implement that decision.  Upon information and belief, Defendant BCCMC has failed to exercise any oversight to prevent violations of the Constitution and the NDS and has failed to take any steps to hold Defendants responsible for such violations.

185.    The ACLU of Florida has third-party standing to assert a First Amendment claim on behalf of clients and prospective clients at Baker.  In addition to experiencing harm as an organization, the ACLU of Florida has a "close relationship" with the individuals at Baker who wished to meet with the Baker Legal Assistance Program about potential legal claims, and these individuals' ability to protect their own rights is hindered by Defendants' denial of access.  *See Kowalski v. Tesmer*, 543 U.S. 125, 130-31 (2004).

## COUNT IV

**Violation of First Amendment Right to Freedom from Retaliation of Detained
Clients and Prospective Clients, Including Plaintiff Mejia Encarnacion
(Denial of Access on September 9, 2022)
(Against All Defendants)**

186.    Plaintiffs incorporate by reference paragraphs 1 through 157 as if set

forth in full herein.

187.    As noted, the First Amendment prohibits the government from

retaliating against individuals and organizations based on their protected

activity.  Corrections officials may not retaliate against detained individuals for

filing grievances or otherwise reporting complaints about the conditions of their

confinement.  *See Boxer X v. Harris*, 437 F.3d 1107, 1112 (11th Cir. 2006) ("First

Amendment rights to free speech and to petition the government for a redress of

grievances are violated when a prisoner is punished for filing a grievance

concerning the conditions of his imprisonment.").

188.    The ACLU of Florida's clients and prospective clients at Baker,

including Mr. Mejia Encarnacion, engaged in protected activity by reporting

abusive conditions to ACLU of Florida attorneys and others, with the hope of

vindicating their constitutional rights and holding BCSO officials accountable for

their misconduct.

189.    Defendants have taken adverse action against the ACLU of Florida's clients and prospective clients, including Mr. Mejia Encarnacion, by canceling the pre-scheduled, pre-approved Know Your Rights presentation and eliminating the opportunity for confidential legal visits with potential counsel.  The cancellation of these visits substantially impairs the ability of the ACLU of Florida's clients and prospective clients to vindicate their constitutional rights and would deter a person of ordinary firmness from continuing to engage in protected activity.

190.    There is a causal connection between the protected activity of the ACLU of Florida's clients and prospective clients and Defendants' adverse actions.  Defendants had knowledge of those individuals' constitutionally protected activity; they are well aware that immigrants detained at the facility have been speaking with ACLU of Florida attorneys for months about the abusive conditions they have experienced.  BCSO officials were physically present during conversations between ACLU of Florida staff and detained individuals during the June 2022 tour of Baker, and BCSO can also identify the individuals with whom ACLU of Florida attorneys have arranged legal calls in subsequent months.

191.    Moreover, several detained individuals have been named publicly in connection with their complaints about Baker, including in the CRCL complaint to which Defendant Rhoden mounted a public response.  There is close temporal proximity between these individuals' constitutionally protected activity and Defendants' decision to deny them access to counsel, which strongly supports an inference of causation.  *See Brungart*, 231 F.3d at 799.

192.    Defendants have provided no justification for denying individuals the ability to meet confidentially with counsel.

193.    Defendants Rhoden, Crews, and Blue all personally and substantially participated in the decision to cancel the ACLU of Florida's pre-approved visit to Baker and deny access to the facility, which was contrary to clearly established law.  Upon information and belief, Defendant Rhoden made the decision to cancel the visit and ordered Defendants Crews and Blue to implement that decision.  Upon information and belief, Defendant BCCMC has failed to exercise any oversight to prevent violations of the Constitution and the NDS and has failed to take any steps to hold Defendants responsible for such violations.

194.    The ACLU of Florida has third-party standing to assert a First

Amendment retaliation claim on behalf of clients and prospective clients at

Baker.  In addition to experiencing harm as an organization, the ACLU of Florida

has a "close relationship" with the individuals at Baker who wished to meet with

the Baker Legal Assistance Program about potential legal claims, and these

individuals' ability to protect their own rights is hindered by Defendants' denial

of access.  *See Kowalski*, 543 U.S. at 130-31.

## COUNT V

**Violation of First Amendment Right to Free Speech of Plaintiff Mejia
Encarnacion, Plaintiff ACLU of Florida, and Detained Clients and Prospective
Clients
(Legal Mail Policies and Practices)
(Against Defendant Rhoden in His Official and Individual Capacities and
Defendant BCCMC)**

195.    Plaintiff incorporates by reference paragraphs 1 through 157 as if set

forth in full herein.

196.    A detained individual's "right to free speech entitle[s] him to use the

mail to communicate confidentially with his attorneys."  *Mitchell*, 10 F.4th at

1230.  Attorneys have a corresponding right to send privileged and confidential

mail to clients and prospective clients.

197.    "Engaging in a 'pattern and practice' of opening legal mail outside of an inmate's presence 'interferes with protected communications, strips those protected communications of their confidentiality, and accordingly impinges upon the inmate's right to freedom of speech.'"  *Id.* (quoting *Al-Amin v. Smith*, 511 F.3d 1317, 1334 (11th Cir. 2008)).

198.    BCSO has adopted a pattern and practice of opening legal mail outside of the presence of detained individuals, including legal mail addressed to Mr. Mejia Encarnacion.  This pattern and practice harms detained individuals, including Mr. Mejia Encarnacion, and their attorneys by denying them the ability to communicate confidentially by mail and thus impairing the attorney-client relationship.

199.    BCSO has also adopted a formal policy that precludes the delivery of legal mail to detained individuals unless the attorney sends a verification email prior to receipt.  That policy is not made publicly available to attorneys and has accordingly led to the denial of legal mail on multiple occasions.

200.    Defendants have no legitimate penological interest in interfering with detained individuals' ability to communicate confidentially with counsel.

201.    BCSO's verification policy harms Mr. Mejia Encarnacion by unjustifiably interfering with protected attorney-client communications.

202.    BCSO's verification policy similarly harms the ACLU of Florida by resulting in the return of protected communications with clients and prospective clients at Baker.

203.    The ACLU of Florida has third-party standing to assert a First Amendment claim on behalf of clients and prospective clients at Baker.  In addition to experiencing harm as an organization, the ACLU of Florida has a "close relationship" with the individuals at Baker who wish to speak confidentially with counsel, and these individuals' ability to protect their own rights is hindered by Defendants' legal mail policies.  *See Kowalski*, 543 U.S. at 130-31.

204.    Defendant Rhoden is responsible for the adoption and implementation of the challenged legal mail policies.  Upon information and belief, Defendant BCCMC has failed to exercise any oversight to prevent violations of the Constitution and the NDS and has failed to take any steps to hold Defendant Rhoden responsible for such violations.

## COUNT VI

### Violation of First Amendment Right to Free Speech of Plaintiff Mejia Encarnacion, Plaintiff ACLU of Florida, and Detained Clients and Prospective Clients
### (Failure to Provide Access to Confidential Legal Calls)
### (Against Defendant Rhoden in His Official and Individual Capacities and Defendant BCCMC)

205.    Plaintiff incorporates by reference paragraphs 1 through 157 as if set forth in full herein.

206.    As noted, detained individuals have a First Amendment right to engage in "uninhibited, confidential communications" with their attorneys. *Mitchell*, 10 F.4th at 1229-30 (quoting *Taylor v. Sterrett*, 532 F.2d 462, 473 (5th Cir. 1976)).  That includes the right to speak to their attorneys outside of the presence of corrections officers.

207.    Attorneys who wish to speak with detained individuals similarly have a First Amendment right to do so.  *See, e.g.*, *Procunier*, 416 U.S. at 408-09.  In particular, the ACLU of Florida has a right to speak confidentially with clients and prospective clients about legal matters in furtherance of the organization's public interest mission.

208.    BCSO has recently adopted a pattern, practice, and policy of refusing to schedule legal calls between detained individuals and attorneys.

Detained individuals accordingly cannot have confidential phone calls with

counsel, as all calls must take place in the housing units where guards and other

individuals are present.

209.    Before this recent change, BCSO had adopted a pattern, practice, and

policy of stationing an officer in the room where scheduled legal calls would take

place, which also precluded detained individuals from having confidential

conversations with attorneys.  BCSO did not permit scheduled legal calls to take

place in private rooms, even though it claims to provide a private, confidential

room for costly VTC visits.

210.    As a consequence of these policies, detained individuals, including

Mr. Mejia Encarnacion, are forced to discuss the details of their cases within the

earshot of BCSO employees and other detained individuals.  Mr. Mejia

Encarnacion has been forced to discuss both his habeas petition and civil rights

cases in front of and within earshot of both BCSO employees and other detained

individuals.

211.    Other clients and prospective clients of the ACLU of Florida have

similarly been forced to discuss their concerns about the conditions of

confinement at Baker in front of BCSO employees and other detained

individuals.  This lack of confidentiality harms the ACLU of Florida by, among

other things, alerting BCSO employees to the nature of the ACLU of Florida's

investigation and steps the organization is taking to hold Defendants

accountable.

212.    Defendants have no legitimate penological interest in overhearing

detained individuals' conversations with counsel.

213.    The ACLU of Florida has third-party standing to assert a First

Amendment claim on behalf of their clients and prospective clients at Baker.  In

addition to experiencing harm as an organization, the ACLU of Florida has a

"close relationship" with the individuals at Baker who wish to speak

confidentially with counsel, and these individuals' ability to protect their own

rights is hindered by Defendants' failure to provide access to confidential phone

calls.  *See Kowalski*, 543 U.S. at 130-31.

214.    Defendant Rhoden is responsible for the adoption and

implementation of the pattern, practice, and policy of refusing to provide access

to confidential legal calls.  Upon information and belief, Defendant BCCMC has

failed to exercise any oversight to prevent violations of the Constitution and the

NDS and has failed to take any steps to hold Defendant Rhoden responsible for such violations.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff ACLU of Florida, on behalf of itself, its employees, and its current and prospective clients, and Plaintiff Jose Luis Mejia Encarnacion request that the Court grant judgment in their favor on all claims and grant the following relief:

a.      Declare that Defendants' conduct, policies, and practices described herein violate Plaintiffs' rights and the rights of the ACLU of Florida's clients and prospective clients' rights under the First and Fourteenth Amendments to the U.S. Constitution;

b.      Enjoin Defendants, their subordinates, agents, employees, and all others acting in concert with them from subjecting Plaintiffs and the ACLU of Florida's clients and prospective clients to the unlawful acts described herein;

c.      Award appropriate compensatory, punitive, and nominal damages;

d.      Award reasonable attorney's fees, costs, and interest;

e.      Grant any other relief the Court deems just and proper.

Dated:  December 6, 2022          Respectfully submitted,

*/s/ Katherine H. Blankenship*
Katherine H. Blankenship (FBN 1031234)
Janine M. Lopez (FBN 1038560)
Daniel B. Tilley (FBN 102882)
ACLU Foundation of Florida, Inc.
4343 West Flagler Street, Suite 400
Miami, FL 33134
Tel:  (786) 363-2700
kblankenship@aclufl.org
jlopez@aclufl.org
dtilley@aclufl.org

Amien Kacou (FBN 44302)
Maite Garcia (FBN 99770)
ACLU Foundation of Florida, Inc.
4023 N. Armenia Avenue, Suite 450
Tampa, FL 33607
Tel:  (813) 288-8390
akacou@aclufl.org
mgarcia@aclufl.org

*Attorneys for Plaintiffs*