UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF FLORIDA, INC., et al.

*Plaintiffs,*

v.

SCOTTY RHODEN, Sheriff, in his official and
individual capacities, et al.,

*Defendants.*

Case No. 3:22-cv-1044-
TJC-LLL

**PLAINTIFFS' CONSOLIDATED RESPONSE IN OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS THE AMENDED COMPLAINT**

Plaintiff American Civil Liberties Union Foundation of Florida ("ACLU-FL")

and Plaintiff Jose Luis Mejia Encarnacion ("Plaintiff Mejia Encarnacion") hereby

submit this consolidated response in opposition to Defendant Baker County

Corrections Management Corporation's Motion to Dismiss, ECF No. 26 ("BCCMC

Mot."), Defendant Sheriff Scotty Rhoden's Motion to Dismiss in his official

capacity, ECF No. 27 ("Rhoden Mot."), and Defendants Rhoden, Crews, and Blue's

Motion to Dismiss in their individual capacities, ECF No. 28 ("Joint Mot.").

Plaintiff ACLU-FL, working with Plaintiff Mejia Encarnacion, other detained

individuals, and other public interest organizations, has spent months investigating

and exposing egregious conditions of confinement at the Baker County Detention

Center ("Baker"), while organizing to improve access to legal information and

representation at the facility.  The Baker County Sheriff's Office ("BCSO"), which, led by Defendant Sheriff Rhoden ("Defendant Rhoden," or "Sheriff Rhoden"), operates Baker, has responded aggressively to this legal advocacy work.  Last year, as public criticism by ACLU-FL and other organizations began to mount and attract local news media attention, BCSO, with only two days' notice and without justification, canceled a long-planned, pre-approved visit to Baker, where ACLU-FL was to be accompanied by a large group of legal volunteers (made up of attorneys and law students) to provide both individual legal consultations with existing clients and legal screenings for prospective clients, as well as a group "Know Your Rights" presentation.  At the same time, BCSO abruptly began implementing an unpublicized mail policy that impedes the delivery of legal mail to detained individuals.  And after ACLU-FL filed this lawsuit, BCSO adopted yet another restrictive policy that outright prohibits the scheduling of legal phone calls.  These retaliatory policies and practices compound longstanding problems with access to counsel at Baker, including the facility's failure to guarantee confidentiality for *any* legal calls.

These actions, policies and practices violate the constitutional rights of ACLU-FL and its clients and prospective clients detained at Baker, including Plaintiff Mejia Encarnacion.  Each of the challenged actions, policies and practices deprives detained individuals and their counsel of the ability to meet and communicate freely and confidentially with counsel, further impeding the latter's ability to vindicate their other constitutional rights.

## STATEMENT OF FACTS

**I.  ACLU-FL's Investigation of Baker and Related Legal Advocacy Efforts**

ACLU-FL has long focused on investigating the conditions at immigration detention facilities and advocating for the rights of individuals held at those facilities. Am. Compl. ¶ 41.  In May 2022, ACLU-FL began focusing its efforts on Baker after receiving increasing reports of serious abuses at the facility, *id.* ¶¶ 43-48, understanding that the facility's geographic remoteness means there are few, if any, civil rights and immigration attorneys in the area who can meet in person with individuals detained there.  *Id.* ¶¶ 62, 99-100.

In June 2022, ACLU-FL attorneys and volunteers from elsewhere in the state toured Baker. *Id.* ¶ 47. Since then, ACLU-FL has continued to investigate the facility and engage in highly publicized legal advocacy efforts aimed at addressing inhumane conditions for detained individuals.  For example, in July 2022, the organization sent Immigration and Customs Enforcement ("ICE") officials a letter identifying emergent and dangerous conditions at Baker and asking ICE to intervene and—should those conditions persist—terminate its contract with BCSO.  *Id.* ¶ 49.  The following month, ACLU-FL sent BCSO an extensive public records request seeking, among other things, use-of-force reports, video surveillance footage, solitary confinement records, and other documents that would shed light on abuses at the facility.  *Id.* ¶¶ 50-52.

Throughout this period, ACLU-FL also publicly denounced the conditions at Baker in multiple news articles. *Id.* ¶¶ 54-58. In July 2022, a local TV news organization interviewed Sheriff Rhoden about the allegations and invited ACLU-FL to respond to his claims.[1] Sheriff Rhoden did not limit himself to denying the allegations; he also stated that he was not going to "allow people to come in here and lie about our facility." *Id.* ACLU-FL stood by the allegations of abusive conditions. *Id.* At an August 18, 2022 meeting of Defendant Baker County Corrections Management Corporation ("BCCMC"), Defendant Crews echoed Sheriff Rhoden when he criticized ACLU-FL for allegedly lying and creating a "public spectacle" with its complaints. *Id.* ¶ 59.

## II.    Defendants' Denial of Access to Baker

In addition to speaking out about the conditions at Baker, ACLU-FL coordinated the development of the Baker Legal Assistance Program (later renamed "Detention Advocacy Program," or "DAP"), a partnership with law school clinics and private attorneys that seeks to expand access to counsel in bond and immigration proceedings and in challenges to detention conditions. *Id.* ¶¶ 60-61. On August 24, 2022, ACLU-FL and the clinics obtained pre-approval from ICE to visit the facility on three dates to conduct Know Your Rights ("KYR") presentations and one-on-one

---

[1] *See* Tarik Minor, *Civil rights groups file complaint alleging 'inhumane conditions' at federal wing of Baker County jail*, News4Jax, July 27, 2022, https://www.news4jax.com/i-team/2022/07/26/civil-rights-groups-file-complaint-alleging-inhumane-conditions-at-federal-wing-of-baker-county-jail/.

legal visits with detained individuals. *Id.* ¶¶ 65-68. Baker confirmed the first visit, set for September 9, 2022, on August 25, 2022. *Id.* ¶ 68. Once the visits were approved, attorneys and students from ACLU-FL and the Florida State University Farmworker and Immigration Rights Clinic ("FSU Clinic") made extensive plans to travel to the facility on September 9, 2022, prepare a KYR presentation, and conduct detailed legal interviews with current and prospective clients. *Id.* ¶¶ 69-71.

Two days before the September 9, 2022 visit, Defendant Evelyn Blue, a BCSO employee, sent an email abruptly "postpon[ing]" the "presentation" until further notice. *Id.* ¶ 73. She further stated that DAP's visit scheduled for September 30 would be "reevaluated closer to that date." *Id.* Defendant Blue provided no explanation in her email for the last-minute cancellation and for putting the Program's future visits into question. *Id.* ¶ 74. When ACLU-FL requested clarification for the cancellation of the KYR presentation and permission to continue with legal visits as planned, Defendant Blue refused to allow ACLU-FL to maintain its plans for legal visits while the presentation was rescheduled, and Defendant Crews replied with an email criticizing ACLU-FL for its "continuous badgering." *Id.* ¶¶ 75-81. Crews later sent an email refusing to schedule the legal visits because they were "not [the] original purpose for tomorrow's visit"—a statement that was demonstrably false. *Id.* ¶¶ 82-83. On the morning of September 9, 2022, when ACLU-FL renewed its request for legal visits in person, another BCSO employee made a similarly false claim that Baker did not have "space" for legal visits that day,

even though the visits had been pre-approved and the attorney-client visitation rooms were visibly unoccupied.  *Id.* ¶¶ 84-85.

To this day, BCSO has never provided an explanation for refusing to allow ACLU-FL to conduct legal visits with its clients and prospective clients in September 2022. Instead, Defendants continue to profess that this episode was merely about rescheduling a group KYR presentation. *See* BCCMC Mot. at 11; Rhoden Mot. at 10-12.  However, as detailed in the Amended Complaint, Defendants' denial of access to Baker on September 9, 2022 harmed Plaintiffs and ACLU-FL's detained clients and prospective clients in three distinct ways: (1) BCSO impeded legal consultations with detained individuals (some with time-sensitive issues) who either had existing attorney-client relationships with the ACLU-FL or had given their names to the ACLU-FL in advance requesting a legal screening; (2) BCSO prevented legal screenings with other detained individuals who signed up to participate in the events of September 9, 2022 but were unknown to ACLU-FL; and (3) BCSO prevented the provision of legal information via the KYR presentation to all interested individuals detained at Baker.  *See id.* ¶¶ 93-96.

BCSO employee Tommy Richardson made clear that the decision to deny ACLU-FL access was made by someone "higher up" in the chain of command than Defendant Blue.  *Id.* ¶ 76.  Upon information and belief, the person who made that decision was Sheriff Rhoden, the chief correctional officer for Baker County, who was Captain Blue's supervisor and who had recently criticized ACLU-FL's legal

advocacy work to the media saying he was not going to "allow people to come in here and lie about our facility." *Id.* ¶¶ 54-58, 77.

## III. Ongoing Barriers to Confidential Communications with Counsel

The ACLU-FL and the DAP's in-person visits are critically important to expanding representation and improving conditions at Baker. That is because in-person legal visits currently offer the *only* real opportunity for detained individuals to speak confidentially with attorneys about the mistreatment they have experienced, as well as the often-sensitive details of their immigration proceedings. As discussed below, neither legal mail nor legal phone calls are a viable option for timely, confidential attorney-client communications at the facility. Barriers on the latter hinder and deter attorney representation of immigrants at Baker, as few are able to visit the facility in person on a regular basis, given its remote location, and many thus have to rely on confidential legal calls to communicate with clients—an impossibility at Baker under the facility's current policy.

A.   <u>Legal Phone Calls</u>.  Individuals detained at Baker have long been unable to have confidential legal phone calls with attorneys. Until November 2022, all pre-scheduled legal calls took place on a single phone in the "law library," a multipurpose room typically used by multiple detained individuals at a time. Am. Compl. ¶¶ 117-19. Under Baker policy, an officer was stationed in the law library at all times. *Id.* ¶ 119. That officer was stationed only a few feet from the phone. *Id.* ¶¶ 119-20. Officers and other detained individuals were therefore within earshot of all conversations that took place. *Id.* ¶¶ 120-23.

Defendant Rhoden references a "six-foot tall privacy partition," Rhoden Mot. at 19, in the "law library," but that is a plastic partition that "does not come close to reaching the ceiling" and "does not prevent others from easily overhearing legal calls." Am. Compl. ¶ 122.

In November 2022, after this lawsuit was filed, Baker changed its approach to legal phone calls for the worse, by categorically refusing to schedule calls in advance. *Id.* ¶¶ 102-03. Accordingly, legal calls no longer take place in the law library at a designated time. Instead, detained individuals must place calls to attorneys from the housing units, where guards and other individuals are constantly within earshot. *Id.* ¶¶ 109-14. Those calls are limited to 20 minutes and are recorded and monitored unless the attorney has previously registered the phone number as an attorney line. *Id.* ¶¶ 111-13. The inability of attorneys to initiate and schedule legal calls severely impairs their ability to develop an attorney-client relationship, gather relevant information (particularly sensitive case or personal information), and effectively advise their clients. *Id.* ¶ 112.

B.    <u>Legal Mail</u>.  The Amended Complaint also challenges two policies and practices that further undermine the ability to communicate with attorneys by mail. First, Plaintiff Mejia Encarnacion has repeatedly received legal mail that has been opened outside of his presence prior to delivery. *Id.* ¶ 144. Second, Baker has implemented a legal mail "verification" policy requiring attorneys to send an email informing the facility any time they send legal mail to a detained individual. *Id.* ¶¶ 131, 135-36. Critically, the policy is not publicly available *anywhere*, and Baker

8

began implementing it only after facing increased public scrutiny over the conditions at the facility. *Id.* ¶¶ 131, 135-36, 141. If an attorney fails to comply with the verification policy, the mail is returned undelivered (or, at best, delayed for an extended period while a verification email is obtained). *Id.* ¶¶ 131, 136. For example, the facility sent back legal mail that Mr. Mejia Encarnacion received in October from his counsel, an out-of-state attorney who was unaware of the verification policy. *Id.* ¶¶ 132-34.

The ACLU-FL needs to correspond frequently with clients and prospective clients at Baker. The ACLU-FL received several pieces of returned legal mail without explanation that were time sensitive and which the ACLU-FL assumed had been properly delivered as legal mail. *Id.* ¶¶ 138-39. These delays and impediments have negatively impacted ACLU-FL's representation.

## ARGUMENT

### I. Plaintiffs Have Stated Plausible Claims for Relief

#### A. ACLU-FL's First Amendment Free Speech Claim Based on the Denial of Access to Baker (Count I) (as to all Defendants)

Civil rights organizations have a well-settled First Amendment right to "associate for the purpose of assisting persons who seek legal redress for infringements" of their rights. *Nat'l Ass'n for Advancement of Colored People v. Button*, 371 U.S. 415, 428 (1963). That includes a right to contact and communicate with clients and prospective clients who "seek vindication of constitutional rights" through litigation. *Id.* at 429-43. Accordingly, the Supreme Court in *Button* held that

it violated the First Amendment to prohibit NAACP attorneys from advising individuals that their rights have been infringed and referring them for legal assistance. *Id.* at 434. The Court found that the state had no compelling interest in regulating the NAACP's constitutionally protected efforts to protect the rights of marginalized groups through litigation. *Id.* at 443. Similarly, the Court recognized in *In re Primus*, 436 U.S. 412 (1978), that ACLU attorneys have a First Amendment right to contact potential litigants. Because the attorneys' communications with a prospective litigant "intended to advance beliefs and ideas," they were protected by the First Amendment. *Id.* at 438 n.32, 439. Discussing these cases, the Eleventh Circuit has clearly recognized that "counsel have a first amendment right to inform individuals of their rights, at least when they do so as an exercise of political speech without expectation of remuneration." *Jean v. Nelson*, 727 F.2d 957, 983 (11th Cir. 1984).

These cases are controlling here. ACLU-FL is a nonprofit organization that engages in civil rights litigation and legal advocacy to advance the rights of marginalized groups, including detained individuals. To achieve its objectives, ACLU-FL attorneys and volunteers meet with clients and prospective clients, inform them of their rights, discuss avenues for legal redress, and in some cases refer them to others for further legal assistance. That is precisely what ACLU-FL planned to do on September 9 during the visits that BCSO abruptly canceled. Under *Button* and *Primus*, that activity falls squarely within the protections of the First Amendment. Indeed, Defendants concede that ACLU-FL has a First Amendment right to "speak

to clients and prospective clients regarding their legal rights and potential claims."
Rhoden Mot. at 10.

Defendants violated ACLU-FL's right to access clients and potential clients
when BCSO cancelled with no justification legal visits that had been planned and
approved in accordance with all relevant policies and procedures.  Contrary to
Defendants' assertion, ACLU-FL is not claiming a right to "unlimited, unfettered,
and unrestricted access to detainees." *Id*.  ACLU-FL's position is that where, as here,
civil rights attorneys have obtained permission to access detained individuals to
discuss their rights and legal options, the First Amendment prohibits government
actors from arbitrarily reversing course absent a compelling interest.  That is
particularly true where, as here, Defendants denied access because of the content and
viewpoints that ACLU-FL, its partners, and its clients and prospective clients were
expected to express during and after the legal visits. Am. Compl. ¶¶ 165.[2]

---

[2] This case is easily distinguished from two Eleventh Circuit cases finding no First
Amendment violation when the government failed to facilitate attorneys' access to interdicted
Haitian and Cuban refugees.  *See Cuban American Bar Association, Inc. v. Christopher* ("*CABA*"),
43 F.3d 1412 (11th Cir. 1995); *Haitian Refugee Center, Inc. v. Baker* ("*HRC*"), 953 F.2d 1498
(11th Cir. 1992).  First, the court emphasized that the interdicted migrants had "no recognized
substantive rights under the laws or Constitution," so "it would be nonsensical to find that
[attorneys] possess[] a right of access … for the purpose of advising them of their legal
rights."  *HRC*, 953 F.2d at 1513.  Here, by contrast, individuals in immigration custody have
well-settled First Amendment and due process rights. Second, the attorneys in *CABA* and
*HRC* required the government to affirmatively facilitate their access to detained migrants—
by, for example, transporting attorneys to Guantanamo Bay.  *See HRC*, 953 F.2d at 1514.
ACLU-FL, by contrast, asked only that Defendants adhere to their prior approval of the visits,
as well as the NDS-mandated policy permitting attorneys to conduct legal visits.  Doing so
would not have involved any meaningful burden or required Defendants to "subsidize"
ACLU-FL's work in any way.  *Id. Finally*, there was no indication in either *HRC* or *CABA*
that the government engaged in content or viewpoint discrimination by denying access to the
attorneys.

As in *Button* and *Primus*, Defendants cannot point to any compelling justification for BCSO's actions. To this day, BCSO *still* has not provided any valid explanation for refusing to allow the planned visits to proceed. Defendants have never suggested that any emergency circumstances or security issues at Baker precluded the September 9 visits. Defendants point to Defendant Crews' broad statement in an email that Baker takes "many factors … into consideration when scheduling visits," including space and staffing. Mot. 10. But that statement is irrelevant here, where the September 9 visit had *already* been approved and scheduled in accordance with the extensive protocols set forth by ICE and BCSO. Am. Compl. ¶¶ 65-68, 72.

Defendants' efforts to downplay these events as merely "unfortunate," Rhoden Mot. at 9-10, are unpersuasive. While Defendants attempt to recast the claims regarding the events of September 9, 2022 as being about Plaintiffs' desire to reschedule a KYR presentation at a convenient time, BCCMC Mot. at 11-12; Rhoden Mot. at 9, this intentionally misses the point. Defendants point to no valid justification for BCSO denying Plaintiffs legal visits and fail to address Plaintiff's allegations that the denial was based on the content and viewpoints that BCSO believed would be expressed during and after the legal visits.

It is also noteworthy that, even assuming the September 9, 2022 legal visits had not been pre-approved, Am. Compl. ¶¶ 67-68, ACLU-FL attempted in the 48 hours prior to September 9, 2022 (i.e., upon being notified of the cancellations) to reschedule legal visits for that date, in an effort to ensure, at a minimum, that legal

consultations with clients and potential clients could go forward as planned (given both time sensitive legal issues and the extensive resources that had already been expended in preparation). *See id*. ¶¶ 83-86. Yet Defendants make no mention of this and instead consistently redirect Plaintiffs' claims regarding September 9, 2022 as merely a "failure to reschedule a presentation," BCCMC Mot. at 11-12, or "rescheduling a group visit," Rhoden Mot. at 9. Defendants' failure to address their refusal to allow legal visits, contrary to the First Amendment, is telling. There was no justification for this refusal.

Further, BCSO continued to impede access to the facility by rejecting the Program's proposed dates for rescheduling. *See* Am. Compl. ¶ 92. Having to reschedule the visit caused substantial harm by preventing detained individuals from consulting with counsel on urgent immigration and conditions-of-confinement issues. *Id*. ¶¶ 94-96, 149-53). The fact that the attorneys may have been able to speak with individuals by phone in the alternative, Rhoden Mot. at 3, did not mitigate the harm, as scheduling such calls is challenging (*see infra* p. 25) and both attorneys and detained individuals understand their phone calls are not confidential (*see infra* p. 7). Defendants accordingly violated ACLU-FL's First Amendment rights by prohibiting attorneys from conducting legal visits with clients and prospective clients on September 9.

Defendants' only remaining argument is that the Court "should be deferential to the officials" who run the detention facility. Rhoden Mot. at 12-13. But in order to receive deference, the officials must at minimum have *some* justification for

interfering with ACLU-FL's First Amendment right to speak with clients and prospective clients. Here, because BCSO never sought to justify the cancellation of the September 9, 2022 visit, there is no basis for granting deference. In *Daker v. Warren*, 660 F. App'x 737, 744 (11th Cir. 2016) (unpublished), for example, the court held that a prison could not rely on "blanket and conclusory" assertions to justify a regulation infringing on prisoners' First Amendment rights.

Here, Defendants have made no assertions at all that could justify BCSO's actions. *See Cf. Procunier v. Martinez*, 416 U.S. 396, 405-06 (1974) (although courts often grant deference to prison authorities, they "will discharge their duty to protect constitutional rights" when faced with conduct that "offends a fundamental constitutional guarantee"). In short, as the Eleventh Circuit has stated, "[d]eference to facility administrators and concerns relating to safety and security cannot be used as a pretext to silence [what the government perceives to be] undesirable speech." *Pesci v. Budz*, 730 F.3d 1291, 1300 (11th Cir. 2013).

## B. ACLU-FL's First Amendment Retaliation Claim Based on the Denial of Access to Baker (Count II)

Even if the arbitrary cancellation of ACLU-FL's approved legal visits did not violate its right to free speech as argued above, it nonetheless violated the First Amendment due to its retaliatory purpose. As the Supreme Court has long emphasized, an act of retaliation violates the First Amendment even if the government could have appropriately taken the same action for other reasons. *See, e.g.*, *Perry v. Sindermann*, 408 U.S. 593, 597 (1972); *Bennett v. Hendrix*, 423 F.3d 1247,

14

1253 n.6 (11th Cir. 2005).  In other words, a plaintiff "need not allege violation of a separate and distinct constitutional right" in order to state a First Amendment retaliation claim, "[r]ather, the gist of a retaliation claim is that a prisoner is penalized for exercising the right of free speech." *Farrow v. West*, 320 F.3d 1235, 1248 (11th Cir. 2003) (internal quotation marks omitted).  A retaliation claim requires the plaintiff to show (1) speech or activity protected by the First Amendment, (2) an adverse action, and (3) a causal connection between the protected speech or activity and the adverse action.  *Bennett*, 423 F.3d at 1250.

Defendants do not appear to dispute that ACLU-FL was engaging in constitutionally protected activity related to Baker.  That includes (in addition to activities scheduled for September 9, 2022) (1) an advocacy letter to ICE of July 26, 2022, the agency that oversees immigration detention at Baker, Am. Compl. ¶ 49, (2) public criticism of the abuses at Baker increasing in the summer of 2022, *id.* ¶¶ 53-58, and (3) previous legal visits where ACLU-FL staff informed individuals about their rights in June of 2022, *id.* ¶ 47.  The First Amendment "protects vigorous advocacy," including litigation to advance the rights of marginalized groups.  *Button*, 371 U.S. at 429.

Contrary to Defendants' assertions, the last-minute cancellation of the September 9, 2022 visit amounts to an adverse action.  A defendant takes "adverse action" when its "conduct would likely deter a person of ordinary firmness from the exercise of First Amendment rights."  *Bennett*, 423 F.3d at 1250 (internal quotation marks omitted).  A plaintiff need not be "actually chilled" in the exercise of their

rights, for good reason; "[i]t would be unjust to allow a defendant to escape liability for a First Amendment violation merely because an unusually determined plaintiff persists in his protected activity." *Id.* at 1250-52.

Applying this test, it is clear that the denial of access to ACLU-FL's clients and prospective clients was highly likely to deter the exercise of First Amendment rights—particularly in light of the circumstances the organization was investigating at Baker. The ability to have confidential conversations with individuals directly experiencing government misconduct is critical to a legal services organization's ability to investigate and challenge those actions. The organization's work is less effective when attorneys are unable to meet with individuals, establish a rapport, and document their complaints. That is especially true at Baker, where there are currently no options for timely and confidential remote communications with attorneys. *See* Am. Compl. ¶¶ 100-14. By canceling ACLU-FL's visit and stating that future visits would be "reevaluated," BCSO directly impaired the organization's ability to achieve its mission and cast doubt over its ability and that of its law school partners to do so in the future. That is a sufficient adverse action to state a First Amendment retaliation claim.

Defendants again try to downplay the constitutional violation and related harm by arguing there was no adverse action in "rescheduling a presentation." BCCMC Mot. at 13; Rhoden Mot. at 14. This argument may be convenient for Defendants but tracks with neither case law nor the facts. The denial of access to the ACLU-FL was an adverse action that would "likely deter a person of ordinary

firmness from the exercise of First Amendment rights." *Bennett*, 423 F.3d at 1250.

*See also Lozman v. City of N. Bay Vill.*, No. 07-23357-CIV, 2009 WL 10699944, at *8

(S.D. Fla. Feb. 12, 2009); *Locker v. City of St. Florian*, No. CV-08-S-907-NW, 2009

WL 10703405, at *5 (N.D. Ala. Oct. 27, 2009) (both rejecting arguments that

because plaintiff continued to engage in protected speech after being retaliated

against, there was no adverse effect on plaintiff's speech).

     Critical to this rule is its objective consideration of a "person with ordinary

firmness." It is highly plausible that organizations and legal service providers of

ordinary firmness would be deterred from engaging in representation of individuals

detained at Baker or less able or willing to expend additional resources to visit Baker

after being denied access without justification and in retaliation for the exercise of

their First Amendment speech.

     Not only that, but Plaintiff ACLU-FL's experience demonstrates the effects of

this adverse action through the direct impediments to its ability to represent clients

and prospective clients, especially those with time-sensitive issues. *See* Am. Compl.

¶¶ 96, 149-151. *See, e.g.*, *Rayford v. Omura*, 400 F. Supp. 2d 1223, 1231-32 (D. Haw.

2005) (sufficient adverse action where plaintiff claimed that "his future advocacy will

be less effective because of his restricted access to potential clients"); *The Chicago*

*Reader v. Sheahan*, 141 F.Supp.2d 1142, 1146 (N.D. Ill. 2001) (sufficient adverse

action where reporter was denied access to certain sources because her articles were

"less effective" as a result).

Defendants Rhoden, Crews, and Blue also argue that the unjustified cancellation of the KYR presentation and denial of legal visits on September 9, 2022 would not deter the exercise of First Amendment rights because BCSO employees eventually provided dates for rescheduling the canceled visit.  Rhoden Mot. at 14. But Defendants again ignore the harm that BCSO's actions caused on September 9 by not allowing attorneys to meet with clients regarding time sensitive issues. Defendants also ignore the fact that the dates they proposed were approximately *three months* from the originally scheduled date, which is a significant delay in any type of legal representation or proceeding, but certainly in immigration detention, or in cases where things can change rapidly. Am. Compl. ¶¶ 92-96.

BCSO also arbitrarily *rejected* the dates proposed by ACLU-FL and DAP, claiming no explanation was necessary.  *Id*. ¶ 92.  Moreover, Defendants' proposed dates were unworkable for the law school clinics that are ACLU-FL's integral partners in the Program; unlike ACLU-FL, the clinics are able to provide direct representation in bond and other immigration proceedings and are therefore pivotal to achieving the Program's objective of expanding detained individuals' access to such representation.  By arbitrarily refusing to accommodate the clinics' schedules, BCSO delayed the Program's visits until months after they would have otherwise taken place and directly undermined its work.

Defendants do not contest that ACLU-FL has alleged facts sufficient to establish a causal connection between its protected activity and Defendants' denial of access to the facility. Nor could they. First, Defendants not only had knowledge of

ACLU-FL's protected activity; some of them had recently publicly criticized the organization's views and actions at Baker.  *See, e.g., Id.* ¶ 57 (discussing interview in which Defendant Rhoden described ACLU-FL's allegations as lying and explicitly stated that he was not going to "allow people to come in here and lie about our facility."); *id.* ¶ 59 (discussing Defendant Crews' criticism of ACLU-FL at a public meeting with BCCMC).  Second, BCSO canceled the planned visit within days of ACLU-FL's constitutionally protected activities, which further supports an inference of causation.  *See Brungart v. BellSouth Telecommc'ns, Inc.*, 231 F.3d 791, 799 (11th Cir. 2000).

Third, the only purported reason ever offered by a BCSO employee for Defendants' action—a lack of space for legal visits—was plainly pretextual.  The visits had been approved well in advance, and attorneys and law students personally observed unoccupied attorney-client meeting rooms at Baker on September 9, 2022.  Am. Compl. ¶¶ 64-68, 82-85.

Finally, Defendants have a clear financial interest in quashing ACLU-FL's protected activity.  Under its agreement with ICE, BCSO receives federal funds for every immigrant detained at Baker.  *Id.* ¶ 25.  ICE can terminate that agreement at any time and is more likely to do so when the facility persistently and egregiously violates its contractual obligations, as ACLU-FL has publicly alleged here.  *Id.* ¶¶ 26-35.  Defendants clearly have an interest in chilling ACLU-FL's legal advocacy,

which has expressed the need to permanently terminate the contract with ICE, given intractable problems at the facility.[3]

Accordingly, ACLU-FL has stated a plausible First Amendment retaliation claim based on the improper denial of in-person access to Baker.

### C. Detained Clients and Prospective Clients' First Amendment Claims Based on the Denial of Access to Baker (Counts III-IV) (as to all Defendants)

Defendants' denial of access to Baker also violated the rights of ACLU-FL's detained clients and prospective clients who intended to meet with ACLU-FL and DAP during its pre-approved visits.  That includes Plaintiff Mejia Encarnacion, whose name appears on the list of individuals that ACLU-FL sent to BCSO officials for the purpose of scheduling legal visits for September 9.  Am. Compl. ¶¶ 78-79.

<u>Count III – Free Speech</u>.  "The Supreme Court has long recognized that an inmate retains those First Amendment rights that 'are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system.'" *Mitchell v. Peoples*, 10 F.4th 1226, 1229 (11th Cir. 2021) (quoting *Turner v. Safley*, 482 U.S. 78, 95 (1987)).  Accordingly, conduct that impinges on prisoners' First Amendment rights is generally constitutional only if "reasonably related to legitimate penological objectives."  *Turner*, 482 U.S. at 87. The Court in *Turner* laid out four

---

[3] Contrary to Defendants' assertion, BCCMC Mot. at 12-13, Rhoden Mot. at 10, Plaintiffs do not argue that a violation of the National Detention Standards ("NDS") amounts to a constitutional violation.  The fact that Defendants are violating the NDS—and that ACLU-FL has made those violations known to the public and to ICE—is instead relevant here to Defendants' retaliatory motive.

factors to determine whether conduct is so reasonably related. *See id.* at 89–90 (first,

"there must be a valid, rational connection between the prison regulation and the

legitimate governmental interest put forward to justify it[,]" the second factor "is

whether there are alternative means of exercising the right that remain open to prison

inmates," a third consideration is the impact accommodation of the asserted

constitutional right will have on guards and other inmates, and on the allocation of

prison resources generally, and, "[f]inally, [the fourth factor,] the absence of ready

alternatives is evidence of the reasonableness of a prison regulation.") (internal

citations omitted).

The Eleventh Circuit, however, has modified the *Turner* standard when the

challenged conduct interferes with the rights of individuals in *civil* detention. *See*

*Pesci*, 730 F.3d at 1297. Civil detention is not punitive in nature. Accordingly, "the

range of legitimate governmental interests is narrower [in the civil detention context]

than it is in a prison context." *Id.* For example, the government "may justify a civil

detention regulation based on its valid, rational connection to legitimate interests in

institutional order, safety, and security," but it may *not* rely on penological

considerations of retribution or deterrence. *Id.* at 1297-98.

Immigration detention is "civil, not criminal, and … nonpunitive in purpose

and effect." *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001). The modified *Turner*

standard therefore applies to conduct that interferes with detained individuals' First

Amendment rights. Defendants' denial of access to Baker on September 9, 2022 is

an example of such conduct. An important component of the First Amendment

right to free speech is the "right to retain and consult with an attorney." *DeLoach v. Bevers*, 922 F.2d 618, 620 (10th Cir. 1990); *see also Denius v. Dunlap*, 209 F.3d 944, 953 (7th Cir. 2000) (same). Defendants interfered with detained individuals' First Amendment rights when BCSO canceled the pre-approved visit of ACLU-FL and DAP and further precluded confidential, in-person communications about potential constitutional violations at the facility. As explained above, Defendants had *no* legitimate interest in denying detained individuals the ability to have confidential legal visits in September 2022. *See supra* pp.12-14.

Defendants Rhoden, Crews, and Blue respond by asserting that Plaintiff Mejia Encarnacion "does not allege and will be unable to establish that he was unable to confidentially communicate with his attorneys . . . at other times and by other means available to detainees at the BCDC." Rhoden Mot. at 16. But that is precisely what the Amended Complaint alleges. Given the legal phone policy in effect at Baker, in-person visits are the *only* opportunity for Mr. Mejia Encarnacion and others to speak candidly with attorneys without BCSO officials overhearing the conversations. *See* Am. Compl. ¶¶ 100-14. But in-person visits are rare in light of Baker's remote location and the significant amount of time and resources required to plan a visit to the facility.

Count IV – Retaliation. Defendants also violated ACLU-FL's detained clients and prospective clients' First Amendment rights when BCSO canceled the September 9, 2022 visit in retaliation for their protected activity. *First*, detained individuals, including Plaintiff Mejia Encarnacion, plainly engaged in First

Amendment-protected activity by reporting the abusive conditions at Baker to ACLU-FL and other advocacy groups, as well as to BCSO, ICE, and other government officials.  *See id.* ¶¶ 44, 46-47 (describing Mr. Mejia Encarnacion's participation in an emergency petition seeking improved conditions at Baker, his filing of an administrative complaint about retaliation and other issues, and his meeting with ACLU-FL).

*Second*, the cancellation of the September 9, 2022, opportunity to meet with counsel was an "adverse action."  It is likely that a detained individual of ordinary firmness would hesitate to continue speaking out about conditions at the facility if doing so leads to the abrupt cancellation of a legal visit with counsel to discuss such complaints regarding the conditions of confinement. *See Bennett,* 423 F.3d at 1254-55 (noting there is "no justification for harassing people for exercising their constitutional rights" and citing to several cases showing a level of harassment that would chill a person of ordinary firmness, such as being detained at a traffic stop for an unreasonable amount of time or issuing retaliatory parking tickets); *see also Pittman v. Tucker*, 213 F. App'x 867, 871 (11th Cir. 2007) (holding that a verbal threat from a correctional officer was sufficient to deter a prisoner of ordinary firmness from filing additional grievances). The Eleventh Circuit also found proof of adverse action because the "alleged retaliatory acts complained of here include a prolonged and organized campaign of harassment by local police officers." *Bennett,* 423 F.3d at 1254.

The *Bennett* court thus agreed that the chilling effect upon a person of "ordinary firmness" can be exacerbated by a pattern of retaliatory behavior, which ACLU-FL's detained clients and prospective clients, including Plaintiff Mejia Encarnacion, have experienced many times over; such as when Baker staff cut off all access to water in retaliation for an organized peaceful protest regarding inhumane treatment at Baker, Am. Compl. ¶¶ 45-6, Baker's decision to cut off the ability to schedule legal calls after the initiation of this lawsuit, *id.* ¶ 11, and the policies and practices of impeding delivery of legal mail. *See id.* ¶¶ 131-47.

*Finally*, there is a causal connection between the protected activity of Plaintiff Mejia Encarnacion and others and the cancellation of the September 9, 2022 visit. BCSO had actual knowledge that detained individuals had spoken to ACLU-FL about the conditions at Baker. *See id.* ¶¶ 53-59. BCSO employees were present during ACLU-FL's initial tour of the facility after which multiple individuals raised complaints. Am. Compl. ¶ 47. The subsequent statements by ACLU-FL—including the letter seeking ICE's intervention and the local news interview with ACLU-FL— made clear that the organization was reporting and investigating firsthand accounts from detained individuals about their experiences. *Id.* ¶¶ 49, 51, 53-59. Defendants Rhoden and Crews criticized the allegations as "lie[s]," *id.* ¶¶ 57-59, and then canceled the very next opportunity for detained individuals to meet confidentially with ACLU-FL staff and share further details about their experiences at Baker. Though material facts remain in dispute, this sequence of events, including the pattern of retaliatory behavior detailed in the Amended Complaint and discussed

herein, combined with BCSO's failure to provide *any* valid or accurate justification for their actions (*see supra* pp. 12-14), provides a sufficient basis, at this stage of proceedings, to infer that BCSO canceled the KYR presentation and refused to allow attorney-client meetings to proceed because of detained individuals' protected activity in violation of their First Amendment rights.

### D. Plaintiffs' First Amendment Claim Based on Legal Phone Call Policies (Count VI) (as to Defendants BCCMC and Rhoden, in his official capacity)

Individuals detained at Baker have long been unable to have confidential legal phone calls with attorneys.  Currently, BCSO refuses to schedule *any* legal calls. Am. Compl. ¶¶ 102-04.  Detained individuals must instead call attorneys from their housing units, where they are inevitably within earshot of BCSO employees and others.  *Id.* ¶ 110.  The calls from the housing units are difficult to coordinate, are allegedly limited to 20 minutes, and are recorded and monitored unless the attorney has registered their number as an attorney line.  *Id.* ¶¶ 111-13. Because Defendants' failure to guarantee confidential calls significantly chills protected attorney-client communications, it violates the First Amendment.

Free Speech Claim.  As explained, a detained individual retains all First Amendment rights that are "not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system."  *Al-Amin v. Smith*, 511 F.3d 1317, 1333 (2008) (quoting *Pell v. Procunier*, 417 U.S. 817, 822 (1974)). Applying this standard, the Eleventh Circuit has made clear that prisoners have a First Amendment right to communicate confidentially with attorneys by mail.  *Id.*

This same principle also guarantees individuals the right to communicate confidentially with attorneys by phone. *See, e.g.*, *Williams v. Price*, 25 F. Supp. 2d 623, 630 (W.D. Pa. 1998). Using the phone, like using the mail, is not inconsistent with one's status as a detained individual. On the contrary, courts have held that individuals in custody retain a First Amendment right to communicate with the outside world by phone, subject to restrictions that are reasonably related to valid government interests. *See Pope v. Hightower*, 101 F.3d 1382, 1384 (11th Cir. 1996).

Protecting detained individuals' ability to speak confidentially with attorneys by phone promotes—rather than undermines—the state's objectives. *See Al-Amin*, 511 F.3d at 1331, 1333.; *see also Wells v. Tucker*, No. 4:10cv441-MP/WCS, 2012 WL 1538366, at *5 (N.D. Fla. Feb. 15, 2012) (confirming that "there is no legitimate governmental purpose to be attained by not allowing reasonable access to the telephone, and ... such use is protected by the First Amendment.") (internal citations omitted).[4] Furthermore, "providing inmates with confidential reliable means of communication with their attorneys about grievances 'releases tension in the prisons and itself advances the state interest in maintaining institutional order and security.'" *Al-Amin*, 511 F.3d at 1330 (quoting *Bieregu v. Reno*, 59 F.3d 1445, 1457 (3d Cir. 1995)).

---

[4] Interestingly, the Report and Recommendation in *Wells v. Tucker* recommended dismissal of the plaintiff's First Amendment claims for certain telephone restrictions. The District Court rejected this recommendation and denied defendant's motion for summary judgement for that claim, allowing Plaintiff's First Amendment claim to proceed. *See Wells v. Tucker*, No. 4:10cv441-MP-WCS, 2012 WL 15383331 (N.D. Fla. May 2, 2012) (report and recommendation adopted in part, rejected in part).

By contrast, requiring individuals to speak with attorneys in front of guards and other detained individuals compromises the attorney-client relationship by making the latter less willing to speak candidly about their grievances. That is particularly true in the context of ACLU-FL's work challenging abuses and inhumane conditions at the facility, since the very officers listening to detained individuals' conversations may be the ones responsible for the misconduct.  Am. Compl. ¶ 155. The reasonable fear of retaliation inhibits detained individuals' willingness to speak openly with attorneys by phone.  Accordingly, detained individuals have a First Amendment right not only to speak with their attorneys by phone, but also to do so in confidence.  *Cf. Denius*, 209 F.3d at 954 ("The ability to maintain confidentiality in attorney-client communications is an important component of the [First Amendment] right to obtain legal advice."); *Johnson-El v. Schoemehl*, 878 F.2d 1043, 1052 (8th Cir. 1989) (noting that "[f]orcing prisoners to conduct their meetings with their attorneys in the open or to yell over the phone obviously compromises the consultation," since "[d]etainees might be hesitant to disclose names and information relevant to the attorney's investigation and necessary to the advice sought").

Because Baker's legal phone call policy impinges on the First Amendment rights of detained individuals, it can be upheld only if "reasonably related" to legitimate government interests. *Pesci*, 730 F.3d at 1297-98; *Turner*, 482 U.S. at 89. The policy does not meet that standard. Applying the first *Turner* factor, there is no "valid, rational connection" between BCSO's refusal to permit confidential legal

calls and any legitimate government interest.  Indeed, Defendants do not even *attempt* to put forth a justification for precluding confidential phone calls, *see* Rhoden Mot. at 18-19, even though the first *Turner* factor is the "most important" in the analysis, *Pesci v. Budz*, 935 F.3d 1159, 1167 (11th Cir. 2019) (*Pesci II*).

Defendants instead rely exclusively on the second *Turner* factor, arguing that Baker provides alternative means of confidential attorney-client communication. Rhoden Mot. at 18-19.  That is factually incorrect.  The Amended Complaint makes clear that Defendants do not guarantee feasible means of communicating with attorneys in a timely and confidential manner. The experience of Plaintiff Mejia Encarnacion demonstrates that confidential legal mail is subject to opening by BCSO officials, undermining this critical form of communication.  *See* Am. Compl. ¶¶ 143-47.  The video teleconferencing option is prohibitively expensive, and not confidential.  *Id.* ¶¶ 105-08, 127-28.  And, generally, in-person visits do not provide a sufficiently accessible alternative for attorney-client communications, given the limited number of attorneys near Baker who can provide immigration or pro bono assistance, its remote location, and Defendants' willingness to deny legal visits as demonstrated on September 9, 2022, without any justification, to suppress unfavored speech, or in retaliation, as alleged in the Amended Complaint. *Id.* ¶¶ 62, 115.

The Eleventh Circuit explained that the "availability of 'other avenues' suggests that we should be particularly conscious of the 'measure of judicial deference owed to correctional officials ... in gauging the validity of the regulation.'" *Pope*, 101 F.3d at 1385 (citing *Turner,* 482 U.S. at 90). Yet no such "other avenues"

are sufficiently available at Baker, and thus the second *Turner* factor also weighs in Plaintiffs' favor.

The remaining *Turner* factors weigh in Plaintiffs' favor as well. There is no indication that providing a confidential space for scheduled attorney calls would burden prison guards or administrators. In fact, Defendants claim BCSO already provides a private space for video visits with attorneys (although whether that characterization is accurate remains disputed). *See* Am. Compl. ¶¶ 127-28. BCSO also has designated three attorney-client meeting rooms near the lobby at Baker, which presumably could also be used for confidential legal calls. *Id.* ¶ 85. Finally, providing a private space for confidential legal calls is an "easy alternative" that "fully accommodates the [detained individuals'] rights at *de minimis* cost to valid penological interests." *Al-Amin*, 511 F.3d at 1331 (quoting *Turner*, 482 U.S. at 91). Defendants' failure to guarantee confidentiality thus violates the First Amendment.

Defendants suggest that Plaintiff Mejia Encarnacion "does not allege that anyone actually overheard his conversations, or that any alleged overheard information was used to his detriment." Rhoden Mot. at 5. This is both incorrect and irrelevant. Drawing all reasonable inferences in Plaintiffs' favor, the Amended Complaint makes clear that officers and detained individuals overheard his conversations with counsel. (In the law library, for example, it is virtually inevitable that officers would overhear conversations when they are stationed so close to the phone. Am. Compl. ¶¶ 119-23.)

In any event, the First Amendment harm arises from Mr. Mejia Encarnacion's inability to have frank, confidential communications with his counsel. As the Eleventh Circuit has explained in the context of legal mail, a free speech claim based on the inability to communicate confidentially with counsel "requires no additional allegation of 'actual injury' because 'protection of an inmate's freedom to engage in protected communications is a constitutional end in itself." *Mitchell*, 10 F.4th at 1230 (quoting *Al-Amin*, 511 F.3d at 1334).

Retaliation Claim. ACLU-FL has also stated a plausible claim that the adoption of the current legal phone call policy is unconstitutional retaliation. The three elements of a retaliation claim are present here. First, ACLU-FL has engaged in First Amendment-protected activity, including the initial filing of this lawsuit in September 2022. *See Button*, 371 U.S. at 429-32 (recognizing public interest litigation as a "form of political association"); *Primus*, 436 U.S. at 431 (same). Second, adopting a restrictive phone call policy that impedes attorneys' work would chill a person of ordinary firmness from engaging in protected activity. Third, there is a direct causal connection between ACLU-FL's activities and the new policy: a BCSO employee informed another immigrants' rights organization that the facility had "suspended legal calls *because of this lawsuit brought by the ACLU of Florida*." Am. Compl. ¶ 104. At minimum, ACLU-FL's retaliation claim based on the legal call policy is sufficiently plausible to survive a motion to dismiss.

### E. First Amendment Claim Based on Legal Mail Policies and Practices (Count V) (as to Defendants BCCMC and Rhoden, in his official capacity)

30

Because "the mail system offers inmates a crucial means of communicating . . . with their attorneys," detained individuals have a well-settled First Amendment right to send and receive confidential legal mail. *Mitchell*, 10 F.4th at 1229. Baker's legal mail policies and practices violate this right.

The Unpublicized Verification Policy. In recent months, BCSO has begun implementing a policy that precludes the delivery of legal mail to detained individuals unless the sender has provided advance notice to BCSO via email about the legal mail. Am. Compl. ¶ 131-39. That policy is not publicly available, *id.* ¶ 135, and many attorneys who represent individuals detained at Baker have no knowledge of the policy, *id.* ¶ 136. As a result, Baker's verification policy results in the censorship of legal mail sent by attorneys who are unfamiliar with its requirements. Plaintiff ACLU-FL, along with Plaintiff Mejia Encarnacion and its other clients or prospective clients, have had legal mail delayed or returned undelivered because of the policy. *Id.* ¶¶ 132-34.

As explained, a regulation that impinges on civilly detained individuals' First Amendment right to receive incoming legal mail must be "reasonably related" to legitimate government interests. *Pesci*, 730 F.3d at 1296-98. Applying the *Turner* factors, the verification policy fails this standard. *First*, there is no "valid, rational connection" between the unpublicized verification policy and any legitimate governmental interest. Even if the government generally has an interest in verifying the identity of a person who sends legal mail, Defendants can invoke that interest only if they take steps to ensure that attorneys *learn* about the policy. Here, there is

no rational connection between the policy and a legitimate penological interest. If attorneys are unaware of the policy, then it is BCSO that is making any sort of consistent compliance with it impossible. If the policy is impossible to apply and results in impeding the delivery of legal mail, then it is wholly unsuccessful and fails to address any valid interest.  Accordingly, the only purpose the policy effectively serves is to arbitrarily interfere with the delivery of legal mail, which is plainly not a "legitimate" purpose under *Turner*.

The Eleventh Circuit's analysis in *Al-Amin* is helpful here:

> As to the first *Turner* factor, a "valid, rational connection" between the prison practice and a legitimate governmental interest, we fully recognize that the government has a strong interest in prison security. However, defendants do not dispute that attorneys are unlikely to send contraband, nor have they articulated a legitimate security interest in opening properly marked attorney mail outside Al–Amin's presence. Indeed, defendants can readily check for contraband if attorney mail is opened in the inmate's presence, and the DOC's own policy provides for opening attorney mail in the inmate's presence. Assuring the inmate of the confidentiality of inmate-attorney mail by opening such mail only in the inmate's presence actually advances the state's interest in promoting institutional order and security.

511 F.3d at 1330–31.

The court's reasoning in *Al-Amin* is applicable in this case. The verification policy is not rationally connected to a valid penological interest. Baker can ensure security and safety through the long-standing policy of opening legal mail in front of detained recipients, as the court confirmed in *Al-Amin*.

*Second*, Baker's unpublicized policy leaves detained individuals with no alternative means of exercising their First Amendment right to receive legal mail. Apart from the mail, the only "option" attorneys have for ensuring that individuals receive time-sensitive documents in a timely manner is to visit the facility and hand-deliver them. That is not an adequate option, given Baker's remote location and the fact that many attorneys with clients at the facility are located across the state or even the country.

*Third*, accommodating detained individuals' First Amendment rights would not significantly impact the staff, other detained individuals, or the overall allocation of resources at the facility. At the very least, it would take no resources at all for Baker to publicize the policy by posting it online or coordinating with ICE to do the same. And eliminating the policy altogether likely would not entail any significant disruption. It would simply require the facility to deliver all incoming legal mail to its intended recipient. Because the facility would still be able to screen the mail for contraband before delivery, this change would not create any security concerns and likely would not require significantly more time or resources than the current verification policy. *See id*.

*Finally*, there are ready alternatives to the unpublicized verification policy, including (1) making the policy publicly available and (2) requiring Baker to deliver all incoming legal mail to recipients, subject to ordinary screening measures. There is no reason to believe either alternative would entail more than a *de minimis* cost to valid government interests.

Defendant Rhoden argues that Plaintiff Mejia Encarnacion's claim based on the verification policy should be dismissed because he "does not allege that he was injured as a result of" his legal mail being returned to his attorney at the Seton Hall Law School's Center for Social Justice. Rhoden Mot. at 17. The Eleventh Circuit, however, has unequivocally rejected any "actual injury" requirement for a First Amendment claim based on interference with a prisoner's legal mail. *See Al-Amin*, 511 F.3d at 1335 ("[A]ctual injury is not a constitutional prerequisite to a free speech claim."). The Court explained that "protection of an inmate's freedom to engage in protected communications is a constitutional end in itself," and concluded that nominal damages may be awarded for the free speech violation without any showing of injury. *Id.* at 1334-35 (internal quotation marks omitted). Mr. Mejia Encarnacion, along with all detained clients and prospective clients whose mail is subject to censorship under the verification policy, has therefore stated a plausible First Amendment claim based on the policy.

The Practice of Opening Legal Mail Outside of Recipients' Presence. As the Eleventh Circuit recently reiterated, "[a] simple rule has governed prison mail procedures in [this] Circuit for nearly 50 years: a prison official may not open an inmate's properly marked legal mail outside of his presence." *Mitchell*, 10 F.4th at 1228. That is because a detained individual's First Amendment "right to free speech entitle[s] him to use the mail to communicate confidentially with his attorneys." *Id.* at 1230; *see also Al-Amin*, 511 F.3d at 1333. And "the only way to ensure that mail is not read when opened . . . is to require that it be done in the presence of the inmate

to whom it is addressed." *Al-Amin*, 511 F.3d at 1330 (internal quotation marks omitted). Thus, "[e]ngaging in a 'pattern and practice' of opening legal mail outside of an inmate's presence 'interferes with protected communications, strips those protected communications of their confidentiality, and accordingly impinges upon the inmate's right to freedom of speech." *Mitchell*, 10 F.4th at 1230-31 (quoting *Al-Amin*, 511 F.3d at 1334). Stated differently, opening legal mail outside of the recipient's presence "chill[s]" detained individuals' speech "by undermining [their] confidence in the confidentiality of [their] communications." *Id.*

Here, the Amended Complaint alleges that Baker officials opened Mr. Mejia Encarnacion's legal mail before delivering it to him on at least six occasions. Accordingly, Plaintiff Mejia Encarnacion has sufficiently alleged that BCSO "open[ed] his legal mail outside his presence." *Mitchell*, 10 F.4th at 1230. Because the Eleventh Circuit has held that "such conduct 'chills, inhibits, or interferes with' an inmate's speech, he has stated a valid claim for a violation of his free speech rights." *Id.* at 1231 (quoting *Al-Amin*, 511 F.3d at 1334). And the constitutional violation does not depend on how many times Plaintiff Mejia Encarnacion's mail was improperly opened. As *Mitchell* explained, Eleventh Circuit precedent "plainly states that opening legal mail outside an inmate's presence is unlawful—it places no numerical qualifications on that rule." *Id.* at 1232.

BCSO's policy prohibiting the opening of legal mail outside of individual recipients' presence does not absolve Defendants Rhoden and BCCMC of liability. Such a policy is not the basis for dismissal where the well-pleaded allegations make

clear that Baker officials have regularly defied the official policy, *see Al-Amin*, 511 F.3d at 1336 n.37, and this fact has been the subject of public complaints. Plaintiffs have pled exactly that in the Amended Complaint. *See* Am. Compl. ¶¶ 143-47.

Defendant Rhoden also appears to suggest that some person other than a BCSO officer was responsible for opening Mr. Mejia Encarnacion's legal mail outside of his presence. Rhoden Mot. at 5, 17-18. This argument makes little sense. The Amended Complaint alleges that "*officers* opened the [legal] mail outside of Mr. Mejia Encarnacion's presence and brought him the opened mail along with a copy of the envelope." Am. Compl. ¶ 145 (emphasis added). In any event, the Court must draw all reasonable inferences in the plaintiff's favor at the motion to dismiss stage, and the most reasonable inference by far is that BCSO employees—the people responsible for handling incoming legal mail and distributing it to detained individuals—were the ones who opened Plaintiff Mejia Encarnacion's mail. *Cf. Al-Amin*, 511 F.3d at 1325 n.16 (rejecting defendant's argument that a "mail sorter" may have opened the envelopes, since the salient fact was that "attorney mail was illegally opened outside [the prisoner's] presence").

Finally, Defendant Rhoden seems to argue that "it is not clear" that mail from the Seton Hall Law School's Center for Social Justice "automatically qualifies as legal mail." Rhoden Mot. at 18. That is unpersuasive: BCSO officials *themselves* understood mail from the Center for Social Justice to be legal mail. That is why mail from the Center was subjected to the legal mail verification policy in the first place. *See* Am. Compl. ¶ 134 (alleging that BCSO sent a "Mail Denial Form" noting that an

envelope from Seton Hall Law School's Center for Social Justice "contains legal papers without a verification email to BCSO").

Defendants do not and cannot argue that *all* incoming mail received by detained individuals is subject to the legal mail verification policy. In addition, the "Mail Denial Form" referenced in the Amended Complaint makes clear that BCSO knew as of October 13, 2022, that Plaintiff Mejia Encarnacion's attorney at the Center for Social Justice had sent him "legal papers." *Id.* Accordingly, Plaintiff Mejia Encarnacion has stated a plausible claim that Defendants violated his First Amendment rights by opening known legal mail outside of his presence.

## II. The Amended Complaint Establishes the Liability of Sheriff Rhoden in His Official Capacity Under *Monell*

Plaintiffs' claims against Sheriff Rhoden in his official capacity are claims against a municipality for purposes of Section 1983. *See, e.g.*, *Quinones v. Durkis*, 638 F. Supp. 856, 859 (S.D. Fla. 1986) (explaining that suing the sheriff in their official capacity "represents another way of pleading an action against the government entity that employs the official"); *see also Richardson v. City of Leeds, Ala.*, 990 F. Supp. 1331, 1333 (N.D. Ala. 1997) ("proof that a municipality's legislative body or authorized decisionmaker has intentionally deprived a plaintiff of a federally protected right necessarily establishes that the municipality acted culpably.").

Under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), a plaintiff suing a municipality must demonstrate that the "deprivation of constitutional rights occurred as a result of an official government policy or custom." *Cooper v. Dillon*, 403

F.3d 1208, 1221 (11th Cir. 2005).  Because the Amended Complaint challenges

official policies and customs adopted by the Baker County Sheriff's Office, Sheriff

Rhoden is liable in his official capacity under *Monell*.

      A.   <u>Denial of Access</u>. Sheriff Rhoden, in his official capacity, is liable for

the unconstitutional decision to deny ACLU-FL and DAP access to their clients and

prospective clients at Baker on September 9, 2022.  It is well-settled that "[m]unicipal

liability may be imposed for a single decision by municipal policymakers under

appropriate circumstances."  *Cooper*, 403 F.3d at 1221 (quoting *Pembaur v. City of*

*Cincinnati*, 475 U.S. 469, 480 (1986) (plurality opinion)).  The Supreme Court in

*Pembaur* explained why that is the case:

> [A] government frequently chooses a course of action tailored to a
> particular situation and not intended to control decisions in later
> situations.  If the decision to adopt that particular course of action is
> properly made by that government's authorized decisionmakers, it
> surely represents an act of official government "policy" as that term is
> commonly understood.

475 U.S. at 481.  Thus, so long as the relevant official "possesses final

authority to establish municipal policy with respect to the action ordered," the

municipality can be liable even for one-time decisions.  *Id.* at 481-83; *see also Mandel*

*v. Doe*, 888 F.2d 783, 793 (11th Cir. 1989) ("municipal liability may attach to a single

decision made by a municipal official if that municipal official is the final

policymaker for the municipality with respect to the subject matter in question").

That appears to be the case here.  Defendant Rhoden is the final policymaker for

BCSO, with final authority to decide relevant matters relating to the Baker County

Detention Center.  *See* Am. Compl. ¶ 19; *see also* Fla. Stat. § 951.061 (providing that county commission may designate the sheriff the "chief correctional officer of the county correctional system" with authority over county detention facilities); *Morrill v. Holmes Cnty.*, No. 5:15-cv-324, 2017 WL 6330631, at *9 (N.D. Fla. Mar. 10, 2017), *report and recommendation adopted sub nom. Morrill v. Holmes Cnty., Fla.*, No. 5:15-cv-00324, 2017 WL 6329951 (N.D. Fla. Dec. 11, 2017) (same); *Jones ex rel. Albert v. Lamberti*, No. 07-60839-CIV, 2008 WL 4070293, at *3-4 (S.D. Fla. Aug. 28, 2008) ("Florida sheriffs act as state officers when supervising inmates and otherwise operating the county jails . . . the County is expressly authorized by Florida law to delegate jail operations to the Sheriff.").

Defendant Rhoden does not dispute that he has final authority over relevant matters related to Baker, including access to Baker; on the contrary, they assert that "*Sheriff Rhoden* and his staff . . . attempt[] to balance space and staffing issues" when deciding which groups will be allowed into the facility.  Rhoden Mot. at 21 (emphasis added).

Thus, a single action by Sheriff Rhoden regarding access to Baker could subject the municipality to liability under *Monell*. Plaintiffs need not point to any "formal, written policy" regarding access, as Defendants suggest.  Rhoden Mot. at 21-22.  It is sufficient that the Amended Complaint alleges that Sheriff Rhoden made the decision to improperly deny ACLU-FL access to the facility.  *See* Am. Compl. ¶ 77.  That decision represents an act of official "policy," which is sufficient to

establish municipal liability.  *See Cooper*, 403 F.3d at 1222 ("[E]vidence of a single violation of federal rights . . . c[an] trigger municipal liability.").

      B.    <u>Legal Mail Policies</u>: Sheriff Rhoden is also liable in his official capacity for the constitutional violations stemming from BCSO's interference with detained individuals' legal mail.  Defendant Rhoden does not even attempt to argue otherwise with respect to the legal mail verification policy.  *See* Rhoden Mot. at 22.  Nor could he, as that is an official, written BCSO policy (albeit one that is not made publicly available).  *See* Am. Compl. ¶¶ 131, 140 (describing BCSO's "written policy governing legal mail").  Accordingly, it can give rise to liability under *Monell*.

      Sheriff Rhoden is similarly liable in his official capacity for the practice of opening legal mail outside of detained individuals' presence.  Although BCSO's formal policy requires legal mail to be opened in the recipient's presence, the actual practice at Baker is to the contrary and is sufficiently pervasive that it constitutes an official government "custom."  *See Sewell v. Town of Lake Hamilton*, 117 F.3d 488, 489 (11th Cir. 1997) ("A custom is a practice that is so settled and permanent that it takes on the force of law.").  As alleged in the Amended Complaint, Plaintiff Mejia Encarnacion has received opened legal mail on approximately six occasions.  Am. Compl. ¶¶ 143-44.  This pattern is far too consistent to amount to a "temporary,

irregular, and limited *deviation from* policy," as Defendant Rhoden argues.[5]  Rhoden

Mot. at 22.

      C.    <u>Legal Phone Call Policies</u>: Finally, Sheriff Rhoden is liable in his

official capacity for the failure to guarantee detained individuals access to

confidential legal phone calls.  Until November 2022, Baker had an official policy

that required all scheduled legal calls to take place in the law library, where they

could be overheard by BCSO employees and other detailed individuals.  Am. Compl.

¶¶ 117-19.  Today, Baker has an official policy that prohibits the advance scheduling

of *any* legal calls and refuses to allow calls to be taken from anywhere other than the

housing units, where BCSO officials and other detained individuals are present.  *Id.*

¶¶ 102-04.

      Defendants wrongly suggest that Sheriff Rhoden is liable only if he "instituted

a policy that precluded confidential communication *altogether*."  Rhoden Mot. at 22-

23 (emphasis added).  As explained, it violates the First Amendment to deny

detained individuals the ability to communicate confidentially with attorneys by

phone, with no legitimate justification for doing so and no other viable alternative for

confidential communications.  *See supra* pp. 32-34.  Sheriff Rhoden's official

policies—i.e., the refusal to provide private spaces for legal calls and the refusal to

schedule such calls in advance—are the "moving force" behind this First

---

[5] If necessary, Plaintiffs are prepared to seek leave to amend their complaint to assert individual-capacity claims against the as-yet-unidentified officers who opened Mr. Mejia Encarnacion's legal mail outside of his presence.

Amendment violation, *Monell*, 436 U.S. at 690-94, because they prevent detained individuals from engaging in confidential attorney-client communications.

## III.    The Individual Defendants Are Not Entitled to Qualified Immunity

Defendants Rhoden, Crews, and Blue are not entitled to qualified immunity on any of Plaintiffs' claims against them in their individual capacities. A plaintiff can overcome qualified immunity "without showing that 'the very action in question has previously been held unlawful.'" *Garcia v. Riley*, No. 21-10439, 2021 WL 4127070, at *3 (11th Cir. Sept. 10, 2021) (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)).  So long as the relevant officials had "fair warning" that their conduct was unlawful, qualified immunity does not apply.  *Hope*, 536 U.S. at 739-40.  A number of sources can provide the necessary notice, including court decisions and existing regulations. *See id.* at 741-46 (where officials had fair warning that their conduct violated the Eighth Amendment in light of circuit precedent and prison regulations limiting the practice).

Denial of Access.  Defendants Rhoden, Crews, and Blue all had notice that their denial of access on September 9, 2022 violated not just their own policies and applicable standards but, most importantly, the United States Constitution. The Eleventh Circuit has followed the Supreme Court in "repeatedly emphasiz[ing] that counsel have a first amendment right to inform individuals of their rights, at least when they do so as an exercise of political speech without expectation of remuneration[.]" *Jean*, 727 F.2d at 983; *see also* Am. Compl. ¶¶ 30-34 (explaining that the NDS set forth BCSO's duties to ensure legal visitation). Moreover, as the court

42

explained in *Bennett*, the Eleventh Circuit "has held since at least 1988 that it is 'settled law' that the government may not retaliate against citizens for the exercise of First Amendment rights." 423 F.3d at 1256.

Not only does case precedent provide notice that denial of access to Plaintiff ACLU-FL and denial of legal visits to its detained clients and prospective clients, including Plaintiff Mejia Encarnacion, especially for retaliatory purposes, is unlawful, Plaintiff ACLU-FL provided written notice of same on September 9, 2022, which Defendant Rhoden chose to ignore. *See* Am. Compl. ¶¶ 87-89.

As alleged in detail in the Amended Complaint, Defendants Rhoden (both in his official and individual capacity), Crews, and Blue took actions to deny Plaintiff ACLU-FL's access to Baker to meet with its detained clients and prospective clients, a protected First Amendment right, and to prevent Plaintiff ACLU-FL's detained clients and prospective clients, including Plaintiff Mejia-Encarnacion, from speaking with counsel, also a protected First Amendment right. These rights are enshrined in case law, and the violation of these rights was the subject of the ACLU-FL's demand letter of September 9, 2022. *See id.*

Any allegation to the contrary by Defendants Blue, Crews, and Rhoden is unsubstantiated and contrary to the evidence available to the Court even at this stage of the proceedings.

## IV.    BCCMC Is a Proper Defendant

BCCMC raises several distinct arguments for dismissal, but none have merit. The Amended Complaint adequately alleges that BCCMC is involved in operating

Baker and is subject to liability for failing to intervene to prevent constitutional violations occurring at the facility.

*First*, BCCMC asserts that it must be dismissed because it "does not operate the Baker County Detention Center."  BCCMC at Mot. 6; *see also id.* (asserting it does not have "any involvement in the operation").  But that assertion is contrary to the well-pleaded allegations of the Amended Complaint, including the allegations that BCCMC is "ultimately responsible for [Baker's] operation" and that federal tax returns indicate the corporation itself "operate[s]" the facility.  Am. Compl. ¶¶ 36-37. Moreover, Defendant Rhoden and his employees regularly provide reports about incidents affecting persons detained at the facility to the BCCMC board of directors, *id.* ¶ 51, which plainly indicates BCCMC's involvement in its operations.  In fact, at a BCCMC Board meeting, where Defendant Rhoden provided a report on Baker and issues related to criminal case against a BSCO corrections officer who allegedly sexually assaulted a detained individual, BCCMC's chairwoman at the time and current board member expressly stated that the management agreement requires BCSO to "immediately" notify BCCMC of "any incidents that happen to these inmates."[6]  The Plaintiffs have sufficiently alleged that BCCMC plays a higher-level operational role at Baker. Plaintiffs should be permitted discovery on the specifics of

---

[6] Joel Addington, *Tempers Flare Over Arrest of Former Jail Deputy,* The Baker County Press (July 2020), https://bakercountypress.com/2020/07/tempers-flare-over-arrest-of-former-jail-deputy.

BCCMC's authority over decision making at Baker before the party is dismissed from the case.

*Second*, BCCMC asserts that the claims against it should be dismissed because Plaintiffs "lumped all of the defendants together." BCCMC Mot. at 7. That is incorrect. The Amended Complaint alleges that Defendant Rhoden, both in his individual capacity and in his official capacity as chief correctional officer for Baker and final policymaker for BCSO, made the decision to improperly deny ACLU-FL access to Baker. Also, in his official capacity, Defendant Rhoden has implemented unconstitutional policies and practices regarding legal mail and legal phone calls. His employees, Defendants Crews and Blue, improperly executed Defendant Rhoden's decision to deny access to the facility. The Amended Complaint further alleges that BCCMC is liable because it has failed to use its authority, as primary owner and operator of Baker, to properly monitor or intervene to prevent these constitutional violations or to hold Defendant Rhoden and his employees responsible for such violations. Am. Compl. ¶¶ 36-40, 166, 177, 184, 193, 204, 214.

Indeed, BCCMC signed a management agreement that requires Defendant Rhoden to adhere to the NDS and reserves the right to terminate BCSO's operation of the facility. Am. Compl. ¶ 19, 23, 24, 27, 36, 38, 40. Yet, despite receiving frequent reports from BCSO notifying BCCMC of complaints and allegations of impediments to counsel and other abuses at Baker, including Sheriff Rhoden's well-publicized decision to deny ACLU-FL access to Baker, BCCMC has taken no preventive or corrective action. *See supra* pp. 3-4. These allegations sufficiently

distinguish the nature of each defendant's wrongdoing. BCCMC notably does not argue that it cannot be held liable for failing to prevent constitutional violations or failing to rectify them when they occur. A "causal connection" can be established between those violations and BCCMC's actions or inaction, when, as is the case here, "a history of widespread abuse puts [BCCMC] on notice of the need to correct the alleged deprivation[s], and [BCCMC] fails to do so." *Hartley v. Parnell*, 193 F.3d 1263, 1269 (11th Cir. 1999). *See also Ingram v. Kubik*, 30 F.4th 1241, 1255 (11th Cir. 2022), *cert. dismissed*, 213 L. Ed. 2d 1082, 142 S. Ct. 2855 (2022) (applying *Hartley* in holding finding sheriff liable for constitutional violations where a sheriff was aware of constitutional violations and failed to investigate or act and finding).

*Finally*, BCCMC asserts that the Amended Complaint does not sufficiently allege that BCCMC is a state actor subject to liability under Section 1983. BCCMC Mot. at 9-11. BCCMC concedes that private actors are deemed to be acting under color of state law in certain circumstances, including where the private party carries out public functions and where the government "has so far insinuated itself into a position of interdependence with the [private party] that it was a joint participant in the enterprise." *Id.* at 10 (quoting *Focus on the Family v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263, 1277 (11th Cir. 2003)). That is the case here.

As the Amended Complaint makes clear, BCCMC is a nonprofit entity whose board is appointed and controlled entirely by the Baker County Board of County Commissioners. Am. Compl. ¶ 23. The entity's articles of incorporation describe the purposes of BCCMC as "lessening the burdens of government by *acting as an*

*instrumentality of Baker County, Florida*." Art. III (emphasis added).[7] Specifically, BCCMC was created to act "in furtherance of the policies of the County to acquire, construct, erect, maintain *and/or operate* one or more jails . . . and to otherwise *assist the County* in its policies of providing adequate jail and incarceration facilities for use by the Sheriff of Baker County, the State of Florida, or other governmental law enforcement divisions[.]" *Id.* The articles further provide that "[a]t the request of Baker County," BCCMC must transfer title to all of its assets to the County. Art. XI. Thus, BCCMC exists to serve the explicitly governmental function of operating a detention facility (i.e., Baker), and it is subject to Baker County's direction and control in carrying out this function. Under these circumstances, BCCMC is appropriately considered a state actor with respect to its role in operating Baker.

In addition, BCCMC appears to acknowledge its role as a state actor by admitting that its meetings and records are subject to Florida's Public Records and Open Meetings Laws. For example, BCCMC provides public notice of its meetings "pursuant to section 286.011, Florida Statutes."[8] That section applies only to "meetings of any board or commission of any state agency or authority or of any

---

[7] *Available at* https://dos.myflorida.com. The Court may take judicial notice of official documents, including articles of incorporation. *State of Wisconsin v. Hitchcock*, 201 U.S. 202, 203 (1906); *see also Grand Lodge, Knights of Pythias, of N. Am., S. Am., Eur., Asia, Afr. & Australia, Jurisdiction of Fla. v. Moore*, 120 Fla. 761, 766 (Florida 1935) (noting that bylaws and articles of incorporation can be judicially noticed).

[8] *See, e.g.*, Notice of Regular Board Meeting on Feb. 20, 2023, https://www.bakercountyfl.org/board/agenda/BCCMC_2202023_1.pdf.

agency or authority of any county, municipal corporation, or political subdivision, …
at which official acts are to be taken."  Fla. Stat. § 286.011.  Indeed, at a recent
meeting, BCCMC agreed to send a representative to an "interagency working group"
with the Sheriff's Office and the Board of County Commissioners for the *express*
purpose of avoiding the public meeting requirements.[9]  The working group appears
intended to allow the three agencies to address issues at Baker more candidly,
including operational concerns like the cost of medical care and building
maintenance issues.[10]  These public statements confirm both that BCCMC is acting
as a state actor and that it is closely coordinating with BCSO regarding operations at
Baker. At this stage of the proceedings, Plaintiffs have sufficiently pled that BCCMC
is a state actor that is charged with the operation of Baker, which has failed in those
duties, causing harm and violating the constitutional rights of Plaintiffs.

## V.    ACLU-FL Has Properly Raised Claims on Behalf of Its Detained Clients and Prospective Clients

Defendants Rhoden and BCCMC argue that the Amended Complaint violates
Federal Rule of Civil Procedure 10 by raising claims on behalf of ACLU-FL's clients

---

[9] *See* Video of BCCMC Meeting, Jan. 10, 2023,
https://www.facebook.com/bakercountyBOCC/videos/1112023-
bccmc/1214962399449951; The same principle of judicial notice of official documents
should apply to this recorded public meeting. *Cf. Hitchcock*, 201 U.S. at, 203 (1906).

[10] *See id.* (Defendant Crews stating "I'm not coming in here and having these things brought
up in public that need to be talked about in private"); *id.* (Defendant Crews reporting that
committee has discussed detention center operations, including number of detained
individuals, medical costs, payment of debt, water damage, and numerous other
maintenance issues).

and prospective clients.  Rhoden Mot. at 15-16.  This argument misses the point of the Rule.  Rule 10 simply requires the complaint to "name all the parties" to the lawsuit.  Fed. R. Civ. P. 10.  So long as ACLU-FL can establish third-party standing to raise claims on behalf of its clients and prospective clients at Baker, it is the only "party" that needs to be named.  To demonstrate third-party standing, ACLU-FL must show (1) it suffered an "injury in fact," (2) "a close relation to the third party," and (3) "some hindrance to the third party's ability to protect his or her own interests."  *Powers v. Ohio*, 499 U.S. 400, 411 (1991).  These elements are easily satisfied here.

*First*, BCSO's cancellation of the September 9, 2022 KYR presentation and legal meetings injured ACLU-FL as an organization by impairing its ability to counsel detained individuals on their legal rights and remedies.  *See Ukrainian-Am. Bar Ass'n v. Baker*, 893 F.2d 1374, 1378 (D.C. Cir. 1990) (finding sufficient injury for standing where "inability to counsel potential" clients "interfere[d] with" ability to provide legal services).

*Second*, ACLU-FL has a sufficiently close relationship with its detained clients and prospective clients at Baker.  In addition to filing this suit, ACLU-FL has submitted written complaints to DHS on behalf of specific detained individuals.  Am. Compl. ¶ 142.  And by operating a hotline that gathers information about abuses at Baker and other facilities, ACLU-FL has identified and developed relationships with numerous other detained individuals who may be involved in future litigation and advocacy efforts.  *Id.* ¶ 48.  The relationship between the

49

organization and these identifiable clients and prospective clients is sufficiently close for third-party standing, as it establishes the identity of interests between ACLU-FL and the individuals whose rights are at issue. *See Kowalski v. Tesmer*, 543 U.S. 125, 131 (2004).

*Finally*, the very policies and practices at issue in this case hinder ACLU-FL's clients' and prospective clients' ability to assert their own rights. Defendants BCCMC and Rhoden have made it virtually impossible for detained individuals to have confidential communications with attorneys who can help them navigate the judicial process.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny the Motions to Dismiss filed by Defendant BCCMC (ECF No. 26), Defendant Rhoden in his official capacity (ECF No. 27), and Defendants Rhoden, Crews, and Blue, (ECF No. 28).

Dated:  March 23, 2023                        Respectfully submitted,

                                                   */s/ Amien Kacou*
                                                   Amien Kacou (FBN 44302)
                                                   Maite Garcia (FBN 99770)
                                                   ACLU Foundation of Florida, Inc.
                                                   4023 N. Armenia Avenue, Suite 450
                                                   Tampa, FL 33607
                                                   Tel: (813) 288-8390
                                                   akacou@aclufl.org
                                                   mgarcia@aclufl.org

Katherine H. Blankenship (FBN 1031234)
Janine M. Lopez (FBN 1038560)
Daniel B. Tilley (FBN 102882)
ACLU Foundation of Florida, Inc.
4343 West Flagler Street, Suite 400
Miami, FL 33134
Tel: (786) 363-2700
kblankenship@aclufl.org
jlopez@aclufl.org
dtilley@aclufl.org

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on March 23, 2023, I electronically served the foregoing

document on all counsel of record through the Court's CM/ECF filing system.

*/s/ Amien Kacou*

Amien Kacou